UNITED STATES of America, George S. McIntyre, and National Bank of Detroit, Plaintiffs,

v.

HADDIX & SONS, INC., and Haddix & Sons Elevators, Inc., Defendants.

Civ. A. No. 22748.

United States District Court
E. D. Michigan, S. D.

May 24, 1967.

John H. Shepherd, Detroit, Mich., for United States of America.

Weipert & Costello, Monroe, Mich., for Receiver.

M. S. Klein, Flint, Mich., The Receiver.

Patrick J. Ledwidge, George B. Mar-

tin, Dickinson, Wright, McKean & Cudlip, Detroit, Mich., for National Bank of Detroit.

## OPINION

FREEMAN, Chief Judge.

This is the third installment in another story of a warehouseman who could not resist the temptation to sell what he should have been storing.[1]

The interested parties have entered into an extensive stipulation concerning the relevant facts. The two defendants in the receivership proceeding of which the present matter is a part are Haddix & Sons, Inc., and Haddix & Sons Elevators, Inc. All of the stock of the former firm is owned by Bud Haddix and his three sons. Voting control and the majority of stock in the latter are held by the other corporation. For present purposes, the two companies will be considered as one entity designated simply "Haddix."[2]

Commodity Credit Corporation is an agency of the United States, existing by virtue of the Act of June 29, 1948, 15 U.S.C. § 714, for the purpose of

"stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities, * * * and of facilitating the orderly distribution of agricultural commodities * * *."

In order to carry out its functions, it operated a number of depots for buying and storing what has become known as surplus farm produce. In the early 1950's with its own space exhausted, Commodity began using private warehouses and elevators.[3] All transactions involving these facilities in the Great Lakes area were conducted through the Evanston, Illinois, office of the United States Agricultural Stabilization and Conservation Service. After selecting an independent warehouse, Commodity signed with the operator a Uniform Grain Storage Agreement under which he was bound among other things to have on hand at all times crops of a kind and in an amount sufficient to satisfy his commitments to all

[1] Previous opinions of this court dealing with other aspects of this case are reported in 249 F.Supp. 88 (1965) and 252 F.Supp. 634 (1966).

[2] As will be noted hereafter, a receiver was eventually appointed for both Haddix corporations. The stipulation indicates that he would testify that upon examining the books of these companies, he discovered a "continual cross-receipt and cross-disbursement of funds" between the two firms. It seemed to him that as a practical matter they had been merged.

The dealings which are the subject of this opinion involved a sale by Commodity to Haddix & Sons, Inc., and a mortgage on the same property given to the National Bank of Detroit by Haddix & Sons Elevators, Inc. For reasons which appear more fully in the text, it would be to the advantage of the Government if the corporations actually should be treated as distinct entities. At an informal conference among the court and counsel for the United States and the Bank held several months prior to the oral argument on the present matter, the Government attorney was instructed that if he wished to rely upon the separate corporate entity argument, he would have to brief the question in advance of the hearing. He failed to do so, and at the argument made only passing reference to the fact that in reality two firms were involved in the transactions. Therefore, the court presumes that the Government is willing to concede that the two companies may be treated as one for present purposes.

[3] The terms "elevator" and "warehouse" are used interchangeably.

While crops placed with a private bailee may properly be said to have been Commodity's, the agency did not necessarily have full title to all of them. According to the standard practice in the case of corn, a farmer would take his grain to a participating elevator, leave it, and receive a receipt in return. He would then deliver the receipt to his county Agricultural Stabilization and Conservation office and use it as collateral for a loan from Commodity based on the official price support value of the produce. By the following August 1, the grower would either repay the advance or decide to forfeit his interest in the grain. In the latter event, his debt was cancelled.

depositors. However, he could commingle his own grain with that of Commodity.

Haddix engaged in a number of enterprises, but at least from 1958 onward its principal source of legitimate income was keeping produce for Commodity. It had built a group of elevators in Michigan, one of which—at Monroe—in late 1961 contained the agency's corn almost exclusively.

By that year even non-governmental repositories were well filled. A new price support program had to be developed. Congress amended Section 16 of the Soil Conservation and Domestic Allotment Act, as amended, 16 U.S.C. § 590p(c), to authorize the Secretary of Agriculture to pay farmers for diverting acreage from corn and grain sorghums to other purposes. Steps were also taken to enable Commodity to sell much of the corn which it had been stockpiling. Between October 1, 1961, and June 30, 1962, this marketing scheme succeeded in reducing the Government's corn inventory by some 800,000,000 bushels.

About November 1, 1961, the Evanston branch requested that ten per cent of the Commodity corn in each of the approximately 3,000 installations under its jurisdiction be loaded out. Even prior to this time, load-out orders had occasionally been dispatched. However, with the commencement of the new program, the directives greatly increased in size and frequency. Furthermore, operators getting orders formerly were generally expected to send the grain to Commodity. Now they had the choice of either shipping or buying for their own accounts. Many took advantage of the modified arrangement, and title to nearly one-half of the total volume of corn subject to load-out orders nationally after October 1, 1961, eventually passed to them for resale.

The mechanics of an Evanston region warehouseman's purchase were simple. After an order had been issued, he could contact the ASCS merchandising division and discuss with one of the personnel the terms of the bargain. A telegram would then be sent to him confirming the sale at a specified price. Commodity relinquished ownership when payment arrived at the Illinois office. It was the policy to refuse to permit an operator to buy up any shortage. In other words, where it appeared that the bailee did not have enough grain in his elevator to meet his obligations to all bailors to whom he was responsible, a prospective sale would not be approved.

The following table depicting the load-out transactions with the Monroe elevator indicates that during 1962 Haddix availed itself of the purchase option with a considerable degree of regularity. It also suggests the increased tempo of Commodity's disposal activities beginning in the fall of 1961:

| Date of Order | Quantity (bushels) | Disposition |
| --- | --- | --- |
| 5–29–61 | 52,068.40 | Shipped |
| 5–29–61 | 8,991.13 | Shipped |
| 11–16–61 | 8,605.42 | Shipped |
| 11–16–61 | 94,075.97 | Shipped |
| 12–13–61 | 161,502.53 | Mostly Shipped |
| 1–12–62 | 145,297.99 | Purchased |
| 1–23–62 | 99,726.12 | Purchased |
| 3–1–62 | 102,389.85 | Purchased |
| 3–16–62 | 102,879.28 | Purchased |

As the chart shows, on March 16, 1962, a load-out order for 102,879.28 bushels went forth. The following May 7, Haddix was informed that it could have 50,-

754.15 bushels of this amount at a price of $1.15½ per bushel with the full remittance due by May 12. A week later the sale of the remaining 52,125.13 bushels was confirmed at $1.16 per bushel with payment demanded by May 19. On May 14 Evanston received a check meeting the terms of the first contract, and another check arrived on May 21 satisfying the requirements of the second.[4]

■■ Haddix had a purchase order dated May 7, 1962, from Ralston-Purina for 102,000 bushels of corn. Purina agreed to pay $1.23½ per bushel plus freight. All Haddix lacked to turn a profit was money with which to pay Commodity. On Friday, May 11, 1962, Bud Haddix set about to remedy this problem. He called upon Mr. Milbert H. Anderson, a loan officer of the National Bank of Detroit, from which his firm had on previous occasions borrowed a total of at least half a million dollars. After their conference, Anderson prepared a memorandum, of which the following is the pertinent excerpt:

> "Bud Haddix was in today to request a loan of $100,000 for Haddix & Sons Elevators, Inc. CCC has issued an out order for 102,000 bushels of corn, and in such cases the government approved warehouse where the corn is stored has the right to purchase the corn. The sales price is $1.16 per bushel, and Haddix has a purchase order from Ralston Purina Company for the entire amount * * *. Shipment will commence immediately and be completed in approximately 30 days. Each day shipments will be invoiced, and payments by Ralston Purina will be made as the corn is received. We propose to make the loan on a demand note basis, guaranteed by Haddix & Sons, Inc. and secured by a special chattel mortgage on the corn and a specific assignment of the Ralston Purina receivables." [5]

This report was presented to the institution's loan committee for consideration at its meeting of Monday, May 14. The Bank verified the content of Purina's purchase order. However, it did not bother to inquire into the availability of the corn to which the security interest would attach because it had had a long, favorable relationship with Haddix, knew that Commodity owned corn in the Monroe elevator well in excess of 102,000 bushels, and had no reason to doubt Bud's representation that Commodity had offered to sell that much. The committee consented to the loan, and it was consummated later the same day when the Bank tendered to Bud Haddix a cashier's check for $100,000. At that time he executed on behalf of Haddix a promissory note in the same amount and a chattel mortgage upon "102,000 bushels of No. 2 Yel Corn presently located in the [Monroe] warehouse," [6] and an assignment of the ac-

---

4. No question has been raised regarding the possibility that Haddix was in breach of contract because his payments arrived several days late. Both drafts were accepted by Commodity and promptly deposited.

It is not clear from the facts whether all the corn in the Monroe elevator was of the same grade. However, each loadout order sent to Haddix was accompanied by specific warehouse receipts which would have indicated in detail the type of corn to be shipped to Commodity or purchased at the operator's option. The record gives no indication of the disposition made of the receipts once the grain had been delivered or bought; presumably they were cancelled or destroyed.

5. Actually, the contract between Haddix and Purina called for delivery within sixty days rather than within the thirty-day period mentioned in the memorandum.

6. The mortgage recites that the security interest was taken upon "102,000 bushels of No. 2 Yel Corn presently located in the warehouse of the undersigned at the place of business hereinafter set forth which goods, chattels, and personal property are now free and clear from all liens, conveyances, encumbrances and levies * * *."

The Government argues that this language shows that the Bank contemplated getting an interest in corn which Haddix owned outright at the time the document was executed. Mr. Anderson's memoran-

counts receivable expected to arise upon Haddix' fulfilling its contract with Purina. The proceeds of the loan were used to make the payments received by Commodity on May 14 and 21.[7]

Bud Haddix neglected to inform Mr. Anderson that the agency had commenced a massive load-out program, that Haddix was insolvent, and most important, that the firm had been converting the Government's corn with the result that on the day the advance was approved, Monroe was short at least 195,000 bushels.[8] The Bank did not stand alone in the dark; Commodity had no knowledge of the conversions. However, the Director at Evanston realized, at least by May 1962, that the extensive load-out activity had hit many operators with a "jolt." The agency also had reason to believe that Haddix was heavily indebted to, among others, the National Bank of Detroit. For a number of years it had been sending storage payments due Haddix to the Bank pursuant to various security arrangements.

Commodity conducted two or more surprise inspections each year of private elevators involved in the storage project. Monroe was checked on November 16, 1961, but the subsequent report gave no indication that deficiencies then existed, although admittedly the examiner did not have access to the daily inventory record, ostensibly because Bud Haddix, the manager there, was out of town and a new girl in the office did not yet know enough about the files to locate it. Nevertheless, during the period from November 16 through November 30, 1961, Monroe was short more than 185,000 bushels of corn. Another unannounced visitation occurred on May 8, 1962. The investigator's evaluation, received in Evanston on May 10, suggested that conditions had been so thoroughly disrupted in the course of loading-out that he was unable to make an accurate estimate whether grain on hand matched warehouse obligations. However, he did comment in writing in general terms of the situation in Michigan that "the disappearance of corn has been phenomenal," and also observed that unless some private soy bean business could be obtained to offset the loss of Government income, Monroe would be doomed.

Eventually, the picture became clear; and on July 16, 1962, in response to the complaint in this action, filed by the United States on behalf of Commodity, the court placed Haddix into receivership.[9] Since most of the Monroe corn

---

dum demonstrates clearly that, the wording of the mortgage notwithstanding, the Bank had no such intention. The institution's loan committee fully understood that the security which the Bank was taking was upon corn not yet belonging to Haddix. Nor is the Bank prevented from contradicting the terms of the mortgage by presenting evidence of the situation as it actually existed. Where third parties have not relied on written instruments, they may not assert the parol evidence rule. 32A C.J.S. Evidence § 861.

7. The stipulation does not demonstrate unequivocally that all of the $100,000 was used to pay Commodity. Conceivably, a few thousand dollars may have been devoted to other purposes. If one of the parties can establish this and believes that the fact is of significance, it may petition for a rehearing to determine the effect of this consideration upon the computation of the amount of the award

to be entered pursuant to this opinion.

8. As used in the fact stipulation, the term "shortage" means the difference between corn inventory and the quantity required to satisfy outstanding "warehouse receipts." The computations thus do not make allowance for any portion of the grain which may belong to and be properly claimed by persons who do not have such receipts. Furthermore, it is uncertain whether by "warehouse receipts" the parties mean only those bailment tickets which meet the test of M.S.A. § 12.119(11), Comp.Laws 1948, § 285.71.

9. Both Haddix corporations and one of the Haddix brothers were convicted of converting Commodity's corn deposited in another Michigan elevator. The United States has never instituted criminal proceedings against either corporation or any of the family on account of the shortage at the Monroe facility.

unquestionably belonged to Commodity, the receiver forwarded all of it to the agency upon the Government's promising to indemnify anyone who was later shown to have an interest in the mass. Prior to the institution of suit, less than 4,000 bushels had been shipped to Purina under the purchase contract. Payment for this quantity was made to the Bank, which applied it on the May 14 loan. However, some $96,000 is still due on the note, and the Bank now seeks to realize upon its chattel mortgage.[10] As of July 16, corn shortages at Monroe totaled at least 222,000 bushels. Haddix remains hopelessly insolvent.

■ The only participants in this phase of the litigation are the Bank and the United States, still representing Commodity. Both parties agree that Michigan law prior to the adoption of the Uniform Commercial Code applies. The Government does not contend that the mortgage was defective in form or that any rights conferred thereunder were defeated by lack of recordation. However, it is said to be totally ineffectual in relation to Commodity for a number of other reasons, the first of which is Section 8 of the Michigan Farm Produce Storage Act, M.S.A. § 12.119(8), Comp.Laws 1948, § 285.68, which provides:

"Acceptance of farm produce for storage by any warehouseman for which a warehouse receipt is issued shall be a bailment and not a sale, and in no case shall the farm produce so stored be liable to seizure upon any process of any court in any action against such bailee, except upon action by owners of such warehouse receipts to enforce the terms thereof, but such farm produce shall at all times, in the event of the failure or insolvency of such bailee, be first applied exclusively to the redemption of outstanding storage receipts for farm produce so stored with such bailee, and

in such event, farm produce on hand in any particular warehouse of the bailee shall be first applied to the redemption and satisfaction of the warehouse receipts issued by said warehouseman as the bailee."

The United States emphasizes the last independent clause beginning in the sixteenth line of the quotation and sees it as requiring that whatever corn was found at Monroe when the receiver took over be used to the extent necessary to redeem outstanding warehouse receipts (practically all of which are held by Commodity) regardless how it entered the elevator and completely irrespective of any other claims to it, which would have to be honored had Haddix not become insolvent. The court would be willing to join in this strict reading of the controversial language were it not obvious that the legislature did not desire a literal construction. The first clause in Section 8 merely states that one who gives a warehouse receipt for produce delivered to him bears the responsibilities of a bailee. This rule was doubtless designed to clarify the rather vague common law regarding the exact meaning of a transaction between a farmer and an operator resulting in a memorandum which could have been a bailment ticket or a sales or option contract. Judges regularly experienced difficulty in deciding, for example, whether the risk of accidental loss fell on the grower or the warehouseman. See Brown, Personal Property 285–94 (2d ed. 1955). The third clause which speaks of "such farm produce" and directs that it be appropriated to warehouse receipt obligations can only have reference to grain which at the time of insolvency was still the subject of a bailment represented by a warehouse receipt. The ultimate antecedent of the word "such" has to be the phrase "farm produce * * * for which a warehouse receipt *is* issued" appearing in the first

10. Several loans, totaling $200,000, made by the Bank prior to the one which gave rise to the security interest in controversy were still outstanding when Haddix went into receivership. Apparently the only security for these debts, each of which was made to one of the Haddix corporations, is a guarantee, now worthless, from the other Haddix firm.

clause, and a document is no longer considered issued once it has been withdrawn. Therefore, the third clause has no relevance here because the receipts originally given to Commodity when it deposited the almost 103,000 bushels of corn which it thereafter sold on May 14 and 21 were invalidated, at least as far as the agency is concerned, when payment was accepted and title released. The point of confusion which allows the Government to urge that, regardless of the inapplicability of the third clause, the fourth and final one is controlling, lies in the fact that the latter does not contain the word "such" in modification of the term "farm produce," and thus does not purely through the force of grammar deal solely with crops still covered by viable warehouse receipts. Nevertheless, it makes neither common nor stylistic sense to order a certain disposition of a carefully specified part and then in the same sentence formulate a similar directive for the whole. The legislature must have been referring to the same commodities in both the third and fourth clauses.

■■ Interestingly enough, the fourth clause employs the adjective "particular" in conjunction with the noun "warehouse" and thus suggests that the draftsmen contemplated a case in which a storage firm maintained several separate depots. It would seem that the authors merely intended that in the event of the insolvency of a bailee under these circumstances, properly receipted produce in one elevator would be used to satisfy

warehouse receipts issued from that unit and that holders of warehouse receipts from each of his installations would not share pro rata in a mass composed of the validly receipted grain in all his facilities.[11]

■■ The Government's view could do great violence to what was presumably the fundamental objective in passing the Farm Produce Storage Act—the protection of persons often inexperienced in the ways of the business world from victimization at the hands of unscrupulous operators. Section 9 of the legislation, M.S.A. § 12.119(9), Comp.Laws 1948, § 285.69, demands that every warehouse receipt furnish information on ten points, including several likely to be considered largely insignificant by the average farmer, e. g., whether the commodities are owned individually or in joint or common tenancy. Section 11, M.S.A. § 12.119(11), indicates that a document which does not cover each of the items enumerated in Section 9 is not a warehouse receipt for purposes of the statute. Certainly the lawmakers did not want to say that a grower who, although holding a piece of paper which because of a minor flaw fails to conform to Section 9, can establish that his contribution was indeed a bailment must forego his interest in favor of a more sophisticated depositor, such as a commercial grain dealer, who requested and received a technically satisfactory receipt.[12] Yet, this may be the outcome in some instances were the Government's argument sound.

11. There may be situations in which grain could properly be considered as produce for which a warehouse receipt had been issued, even though none in fact was written when it entered the elevator. As will be pointed out in the text, it is generally held that a warehouseman who cannot meet his storage obligations and deposits his own grain into the mass loses title to at least some of it. The newly introduced produce is said to be immediately appropriated to the benefit of the bailors to the extent necessary to remedy the deficiency. The construction which the court proposes for Section 8 would not

stand in the way of warehouse receipt holders' claiming this grain in the event of insolvency.

12. There is no doubt that the legislature did not intend to penalize, as the Government would, growers who neglected to procure a formally sufficient warehouse receipt. In Section 13 of the Act, M.S.A. § 12.119(13), all "depositors" are said to be tenants in common in a commingled mass of stored grain according to their respective contributions. Furthermore, according to this provision, the operator's responsibility for redelivery extends equally to all "depositors."

■ The United States next concentrates on Section 13, M.S.A. § 12.119(13), Comp.Laws 1948, § 285.73:

"If authorized by agreement or custom, warehousemen may commingle fungible farm produce with other farm produce of like kind and grade. In such case, the various depositors of the mingled goods shall own the entire mass in common, and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole, and the warehouseman shall be liable, severally, to each depositor for the care and redelivery of his share of such mass to the same extent and under the same circumstances as if the goods had been kept separate, and a warehouseman may dispose of only that quantity of any part of any fungible mass of farm produce that shall be in excess of the amount covered by any outstanding warehouse receipts issued by him."

Once again the focus of attention is the final independent clause which is said not only to prohibit a warehouseman from selling short but also to make it impossible for him under any conditions to convey rights in a bailor's produce and, moreover, where it is already short, to treat as his even a part of the mass equal to a portion for which he paid full value and thus supposedly owns. One would be hard pressed to find the second aspect of this interpretation explicitly supported by the language which seems on its face just to prescribe the duties of an operator toward storage customers and not to determine the claims of third parties who innocently do business with him—especially when it involves grain which, at least absent a pre-existing shortage, was clearly his. Nevertheless, merely to expedite the resolution of this matter, it will be assumed that the United States has accurately described the import of the enactment.[13] The court's holding, however, although threefold, is much more narrow: Section 13 does not restrict the ability of a possessor of warehouse receipts to sell his share of the bailed crops, does not disqualify an operator from contracting to buy it, and does not prevent the warehouseman from financing the purchase in a manner consistent with the hypothesis so that creditors' rights depend upon neither what he can do with his interest after he gets it nor any pretense of mortgaging somebody else's title.

■■ Apart from the Act, the Government relies almost exclusively upon Hall v. Pillsbury, 43 Minn. 33, 44 N.W. 673, 7 L.R.A. 529 (1890). The case is cited both as insurance against the court's rejecting the previously discussed proposed construction of Section 13 relative to a bailee's personal contribution and as a rebuttal to the Bank's position that, regardless of the meaning of this provision, a bailor may be estopped to assert that his warehouseman lacked the power to sell any grain in an elevator into which the latter was permitted to place his own commodities. This defensive role should be considered first. Normally, of course, no one can convey what is not his. The doctrine applies generally to bailees who, having no proprietary rights in the stored goods, can transfer none. See Brown, op. cit. supra at 242. On the other hand, it is universally admitted that an owner who has even implicitly left the impression that another has authority to sell cannot deny that good title passed to a bona fide purchaser who acted in accordance with this representation. Id. at 240–46. Pillsbury holds that simply putting produce into a warehouse likely to also contain the operator's crops in which he will deal is not sufficient to clothe him with such indicia of ownership that an estoppel can arise. This was the law in a number of states. See Kastner v. Andrews, 49 N.D. 1059, 194 N.W. 824 (1923); Kimbell

---

13. This assumption, of course, relates to the law as it existed prior to the legislature's enacting the Uniform Commercial Code. It is unnecessary at this time to consider the effect, if any, of Code Section 7–205, M.S.A. § 19.7205, Comp.Laws 1948, § 440.7205 [P.A.1962, No. 174], upon Section 13 of the Farm Produce Storage Act.

Milling Company v. Greene, 141 Tex. 84, 170 S.W.2d 191 (1943). Not all courts espoused it, however. See Preston v. Witherspoon, 109 Ind. 457, 9 N.E. 585 (1886). More impressive in terms of contemporary practice, neither did the proponents of the Uniform Commercial Code. See UCC § 7–205.

Whether this facet of *Pillsbury* represented the Michigan approach in 1962 is of only academic concern, for the opinion and the whole estoppel theory to which it relates are not germane on the present facts. The decision is inapposite when a depositor himself disposes of grain. The rule and its rationale are pertinent only where an operator tries on the strength of his ostensible interest to assign rights greater than those which he actually has. Haddix never had a substantial claim of other than a possessory nature to the corn in dispute. Furthermore, the Bank fully appreciated this fact and indeed did not intend that Haddix get such a claim until the loan had been repaid. These observations lay bare the heart of the matter.

The United States agrees that Haddix always lacked a commanding equity in the corn. Its assent rests upon dicta in *Pillsbury* that a warehouseman who does not have sufficient produce on hand to meet his bailment obligations and adds his own to the mass immediately loses title to so much of the newly introduced amount as would be necessary to redeem outstanding receipts were they then submitted for satisfaction. Here also the Minnesota court is not alone in its view. See State ex rel. Hermann v. Farmers' Elevator Co., 59 N.D. 679, 231 N.W. 725 (1930). The Government urges that even if Section 13 does not prevent a warehouseman from trading in that portion of the commingled commodities which once belonged to him but at the time of sale fails to constitute a quantity in excess of that required to meet storage commitments, this *Pillsbury-Hermann* proposition, coupled, if need be, with the non-estoppel rule, does. Adapting the reasoning of these cases to the present circumstances, it follows that when Commodity surrendered its title upon receipt of appropriate payment, that very property immediately revested in the agency because the grain was in the Monroe elevator and already intermixed with that of Commodity, the victim of the shortage created by Haddix, the bailee-buyer. The crucial corollary is that there was no moment at which Haddix had a meaningful interest to which the mortgage could attach.[14]

On the other hand, the Bank could as easily contend that there was no point in time following relinquishment of title when it did not have a valid claim to the produce so that no occasion arose for the reversionary doctrine relied on by the Government to cause the agency to regain unencumbered ownership. When Bud Haddix executed the mortgage, his corporation's proprietary rights in the corn were nonexistent. However, under the law relative to liens on after-acquired goods, the security interest became affixed as soon as Commodity was paid. See 1 Jones, Chattel Mortgages and Conditional Sales, § 170 (6th rev. ed. 1933).[15]

---

14. Presumably under the *Pillsbury* dictum a short warehouseman would retain a minor residual interest in his own grain despite commingling in the sense that the produce could become his again if he later bought up the shortage by paying the bailors sufficient compensation for the losses due to his conversions.

15. It has been held in Michigan that a purchase money mortgage is not an after-acquired security interest. Greenaway v. Fuller, 47 Mich. 557, 11 N.W. 384 (1882). Certainly the court in *Greenaway* did not mean to suggest that the mortgagee got rights in the goods before the vendor had relinquished his title upon payment of the purchase price. The case would be authority, however, for the proposition that in Michigan a purchase money mortgage is treated as a legal rather than an equitable interest. Thus, it would differ from the ordinary security obtained on property which the mortgagor does not yet own; for at common law, such a mortgage was normally totally ineffective against third parties and depended upon a court of equity for its enforcement. See 1 Jones, Chattel Mortgages and Con-

Therefore, presuming the correctness of the *Pillsbury-Hermann* theory, the most that can be said categorically is that Haddix' obligations to both Commodity and the Bank served to limit the interest which Haddix obtained from the transaction. There is still no justification for stating with any degree of certitude that a particular contestant's rights were established more quickly than its opponent's. Because the terms "title" and "mortgage" identify mental constructions rather than physical things, no method is available to assist in determining which of several potential paths open at a particular instant to the many identical rights encompassed within the meanings of both of these expressions would have been followed. Hence, the question must be not whether Commodity or the Bank first obtained such an interest that nothing worth fighting about remained, but rather whether there is a reason why one claim is superior to the other where in terms of temporal priority they would have to be considered equal. While the specific setting in which the problem occurs may be unusual, the principles which dictate the solution are regularly employed in comparable situations.

▇▇▇▇▇ Courts have long found a difference between an ordinary collateral interest in property not belonging to the debtor when the loan is made and that given in exchange for an advance used to pay for the property. Doubtless the varying treatment stems from the recognition that a creditor who supplies the purchase money, although formally a mortgagee, is in many respects the real buyer. His investment causes the vendor to renounce ownership, and after the sale is completed, his equity in the subject matter is greater than the nominal purchaser's. Most important, he relies upon the seller's title, not the mortgagor's. If the law frowns upon using the goods of one man to satisfy the debts of his neighbor, consistency demands that a purchase money mortgage not be subordinated to a claim against only the vendee. Indeed, this type of security invariably takes precedence over an antecedent lien stemming from a judgment against the mortgagor.[16]

▇▇▇ The stipulation, let alone Mr. Anderson's memorandum, clearly demonstrates that the Bank in good faith took a purchase money mortgage. Therefore, its position should be as analogous as possible to that of a grain dealer, for example, who may have approached Commodity and bargained for some of the corn at Monroe. Once the agency had

---

ditional Sales, §§ 138–9, 170 (6th rev. ed. 1933). Furthermore, in Michigan a purchase money mortgage would not be subject to the rules which often subordinate equitable to legal interests. See generally 2 Pomeroy, Equity Jurisprudence, §§ 678–92 (5th Simons ed. 1941).

16. Because a noncontractual lien against chattels often requires possession for perfection, most of the cases involving contests between purchase money mortgagees and holders of interests of this nature involve land. The logic, of course, is equally applicable to all types of property. In reference specifically to purchase money security interests in realty, it is said that the doctrine of priority is applicable in the context of "all liens legal or equitable, that might otherwise clasp the land· at and with its acquisition by the mortgagor." 2 Glenn, Mortgages, § 345.1 (1943).

The holder of a conflicting security interest based on a claim against the mortgagor-vendee normally loses nothing by having his rights subordinated to those of the purchase money mortgagee. Had it not been for the latter's willingness to make available the purchase price, title to the property would never have left the hands of the seller, where, of course, it was unavailable for satisfying the buyer's obligations.

It appears that absent consent or unusual circumstances, the only time a purchase money mortgage is inferior to another claim is in a contest between a third party mortgagee who supplied only part of the price and the seller who maintained a security interest pending payment of the whole amount due on the sale. In this situation, typically the vendor will prevail. See e. g., Fecteau v. Fries, 253 Mich. 51, 234 N.W. 113 (1931). However, the result may differ if the seller had reason to know that a third party was furnishing some of the purchase money. See 55 A.L.R.2d 119 (1957).

surrendered title it would hardly hope to look to such produce for compensation for Haddix' misconduct. Similarly, it may not appropriate the Bank's interest. The inherent unfairness of the contrary conclusion is highlighted by the peculiar facts in this case. Commodity could not have expected the participating bailees to have the cash to pay for the millions of dollars' worth of crops made available under the new program. It certainly anticipated third persons or institutions would furnish the resources and by implication invited their cooperation. Although the Government evidently feels no qualms about taking the money but disavowing all responsibility to them, this concept of financing is at odds with the entire purchase money mortgage doctrine, which in essence is "merely another working of the principle that prevents unjust enrichment." 2 Glenn, Mortgages, § 349 (1943).

Fundamentally, Commodity is no better off than a non-purchase money mortgagee who relies on a standard after-acquired property clause. Each has in its own way given value for the rights it claims—and these, incidentally, in the event of insolvency, are virtually the same. Just as the creditor could have obtained no interest in the collateral until his mortgagor owned it, title to the corn could have revested only after Haddix had received it from the agency.[17] In a contest between the secured party and a purchase money mortgagee, be he the vendor or an outsider, the latter would prevail. See Hammel v. First National Bank of Hancock, 129 Mich. 176, 88 N.W. 397 (1901); 2 Pomeroy, Equity Jurisprudence, § 725 (5th Simons ed. 1941). Likewise, the National Bank of Detroit succeeds here.

An order in accordance with this opinion shall be submitted.

---

17. At no time has the Government suggested that title never left Commodity. Its arguments have all been based on the premise that Haddix had ownership but instantaneously lost it, was unable to mortgage it, or, if the firm could give a mortgage, the Bank cannot realize upon the security interest because of Section 8 of the Farm Produce Storage Act.