In re CROUTHAMEL POTATO CHIP CO. INC., Debtor.

JENSEN–McLEAN COMPANY, INC., Plaintiff,

v.

CROUTHAMEL POTATO CHIP COMPANY, INC., Defendant,

and

Westinghouse Credit Corporation, Defendant Intervenor.

Bankruptcy No. 79–01939G.
Adv. No. 79–0016G.

United States Bankruptcy Court,
E. D. Pennsylvania.

Sept. 25, 1980.

Diane J. Sigmund, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for plaintiff Jensen–McLean Company, Inc.

Marvin Krasny, Adelman & Lavine, Philadelphia, Pa., for debtor/defendant Crouthamel Potato Chip Company, Inc.

Marjorie O. Rendell, Duane, Morris & Heckscher, Philadelphia, Pa., for defendant intervenor Westinghouse Credit Corp.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

■ The issue at bench is whether a party who asserts that the debtor bought a piece of equipment as an agent of that party is entitled to reclaim that equipment over the objections of the debtor and of a secured creditor who holds a security interest in all of the debtor's present and after–acquired equipment. We conclude that the reclaiming party is entitled to the equipment inasmuch as the debtor, in purchasing the equipment, was only acting as the agent of that party and, therefore, did not acquire any rights in that equipment which would entitle it thereto or to which a security interest could attach.

The rather complicated facts of the instant case are as follows:[1] Crouthamel Potato Chip Company, Inc. ("Crouthamel") was a producer and packager of potato chips. In early 1977 Crouthamel began producing canned potato chips for the Daddy Crisp Company ("Daddy Crisp") using specialized equipment ("the can line equipment") owned by Daddy Crisp. In conjunction with the can line equipment, Crouthamel used other equipment which it purchased itself with funds made available by Westinghouse Credit Corporation, Inc. ("Westinghouse"). Westinghouse had loaned various amounts of money to Crouthamel in the past and had obtained a security interest in, among other things, all of Crouthamel's present and after–acquired equipment. That security interest was perfected by Westinghouse by filing financing statements in the proper offices.

On July 31, 1978, Crouthamel ceased producing canned chips for Daddy Crisp apparently because Daddy Crisp had failed to pay amounts due on past orders. Shortly thereafter, Crouthamel and Daddy Crisp instituted suits against each other which became very heated and protracted and which prevented Crouthamel from using the can line equipment.[2] John Crouthamel, the president of Crouthamel, determined. at that time that, in order to use the can line equipment again, Crouthamel would have to purchase that equipment as well as settle the Daddy Crisp litigation. He was anxious to do so as expeditiously as possible since the sale of its canned chips accounted for about 50% of Crouthamel's profits. However, all of Crouthamel's efforts to obtain financing for the purchase of the can line equipment were unavailing.

Some time in April, 1979, John Crouthamel was contacted by Wally Nelson, the vice president and chairman of the board of directors of the Jensen–McLean Company ("Jensen–McLean"), an exporter of food products to various countries around the world. Jensen–McLean had been selling canned chips which were produced by Western Crisp in the same manner as Crouthamel produced its canned chips. Jensen–McLean had developed a sizeable market overseas for canned chips because of the chips long shelf life and lack of preservatives. However, in early 1979, Western Crisp went into receivership and Jensen–McLean had to find another source of canned chips. The only other producer of canned chips in the country was Crouthamel.

When Wally Nelson contacted John Crouthamel in April, 1979, they quickly agreed to enter into a business relationship

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

2. Although a temporary restraining order enjoined Crouthamel from using the can line equipment for only ten days, Crouthamel did not use the equipment for over eight months for fear of further legal action by Daddy Crisp.

for the purpose of selling canned chips overseas. However, they understood that the Daddy Crisp litigation would have to be settled and the can line equipment would have to be purchased before Crouthamel could begin to produce canned chips again. Crouthamel was unable to pay for the can line equipment by itself and had been unable to find financing for its purchase of that equipment although negotiations were still being conducted with a number of possible sources.

After numerous discussions on the phone and after visiting the Crouthamel plant, Wally Nelson and John Crouthamel agreed that Jensen–McLean would provide the money with which Crouthamel would buy the can line equipment, in exchange for which Jensen–McLean would get 10% of the capital stock of Crouthamel.[3] However, on May 15, 1979, the day of the closing for the sale of the equipment, the attorney for Crouthamel advised both Wally Nelson and John Crouthamel that a sale of Crouthamel's stock was impossible because it would violate both the federal and state securities law. Wally Nelson and John Crouthamel therefore suggested that the deal be arranged so that Jensen–McLean would loan Crouthamel the money with which to buy the equipment in exchange for a future sale of stock. Since Crouthamel's attorney advised them that that would also violate the securities laws, it was agreed that Jensen–McLean would itself buy the can line equipment and that it would transfer the equipment to Crouthamel when Crouthamel had complied with the securities laws and could legally transfer the stock to Jensen–McLean.

Because of the animosity of the owner of Daddy Crisp towards Wally Nelson, however, it was agreed by the parties that Wally Nelson should not go to the closing and that his identity as the actual purchaser should not be revealed. Therefore, it was agreed that John Crouthamel would go to the closing for Jensen–McLean and present its check for the equipment. Accordingly, John Crouthamel attended the closing with his attorney and presented Jensen–McLean's check to the National Bank of Georgia ("the Bank"). The Bank was the owner of the can line equipment at that time as a result of foreclosing on a mortgage it held on the property of Daddy Crisp.[4] Because the check was not a certified check, however, the Bank refused to deliver the bill of sale. Consequently, all the documents were held in escrow until Jensen–McLean could wire the money to the Bank.[5] When everything was done as required by the escrow agreement, on or about May 25, 1979, the Bank released the bill of sale to Crouthamel's attorney. The bill of sale was made out to Crouthamel since the parties had originally understood that Crouthamel was to be the purchaser.[6] Therefore, Crouthamel's attorney typed an assignment on the back of the bill of sale and sent it to John Crouthamel to execute and send on to Jensen–McLean. The attorney also drafted an agreement granting Crouthamel an option to buy the equipment within ninety days. On receipt of those documents, John Crouthamel executed the assignment and turned all of the papers over to Anthony Mazullo, the secretary and general counsel

3. The original agreement apparently contemplated that Crouthamel would issue new stock. However, the parties later agreed that the two stockholders of Crouthamel, John and Willard Crouthamel, would each transfer 10% of the Crouthamel stock to Jensen–McLean. Jensen–McLean was to provide the $90,000 needed to buy the can line equipment and have an option to buy another 10% of the stock for $100,000.

4. The can line equipment has remained in the possession of Crouthamel throughout. The Bank was told at the closing the identity of the actual purchaser, Jensen–McLean, although Daddy Crisp was not told.

5. The Bank's attorney acted as escrow agent. The escrow agreement provided that Crouthamel would turn over certain other equipment owned by the Bank and held by Crouthamel, that Crouthamel would sign documents releasing Daddy Crisp from all liability, and that Jensen–McLean would wire the money.

6. Crouthamel's attorney testified that the Bank had drawn up the bill of sale prior to the closing and that the Bank was not informed until the closing that Jensen–McLean was the purchaser.

of Crouthamel, who, after redrafting the option, forwarded them to Jensen–McLean on June 18, 1979. Brooke Nelson, the president of Jensen–McLean, executed the option on June 29, 1979, but failed to return it to Crouthamel. However, Anthony Mazullo had spoken to Brooke Nelson by telephone and learned that Jensen–McLean had no objection to giving the option to Crouthamel. Furthermore, no one at Crouthamel ever pressured Jensen–McLean for a return of the option.

Meanwhile, John Crouthamel had offered Wally Nelson a position on the Crouthamel board of directors which he had accepted. Thereupon, Wally Nelson was formally nominated and elected to that position on June 21, 1979. During the summer he attended board meetings and kept in constant contact with Crouthamel, generally about its production of canned chips which Jensen–McLean was selling overseas pursuant to their broker agreement.[7] However, Crouthamel never provided Jensen–McLean or Wally Nelson with the up–to–date financial statements he requested nor did it make any attempt to comply with the requirements of the securities laws.[8]

In October, 1979, Wally Nelson attended a board of directors meeting at the Crouthamel plant which was disrupted by the appearance of several of Crouthamel's unsecured creditors. Following that chaotic meeting, Crouthamel filed a petition for an arrangement under Chapter 11 of the Bankruptcy Code ("the Code")[9] on October 16, 1979. On November 21, 1979, Jensen–McLean filed a complaint for an order declaring Jensen–McLean to be the holder of all title to the can line equipment and directing Crouthamel to turn that equipment over to Jensen–McLean. Crouthamel, in its answer and counterclaim, asserted that it was the owner of the equipment and that

Jensen–McLean owed it $100,000 under their agreement with respect to the sale and purchase of Crouthamel stock. In an amended answer, Crouthamel further asserted that, even if Jensen–McLean owned the equipment, the transfer of that equipment by Crouthamel to Jensen–McLean was a voidable preference pursuant to section 547(b) of the Code. Subsequently, on December 13, 1979, Westinghouse filed a motion to intervene which motion we granted on January 4, 1980, by consent of all parties. In its answer and counterclaim, Westinghouse asserted that it holds a security interest in all of Crouthamel's equipment, that Crouthamel acquired title to the can line equipment in May, 1979, that Westinghouse's security interest thereupon attached to that equipment, and that, consequently, Westinghouse's interest is superior to any interest asserted by Jensen–McLean.

1. Rights in the can line equipment of Jensen–McLean versus Crouthamel.

The issues presented by Crouthamel in its answer are whether Jensen–McLean ever got title to the can line equipment and, if so, whether the transfer of title to the equipment from Crouthamel to Jensen–McLean was a voidable preference or whether Jensen–McLean was obligated to transfer that equipment and $100,000 to Crouthamel in exchange for 20% of Crouthamel's stock.

In support of its argument that Jensen–McLean never got title to the can line equipment, Crouthamel contends that the agreement between it and Jensen–McLean was that Jensen–McLean would provide the money with which Crouthamel would buy the equipment and that Crouthamel would then assign it to Jensen–McLean subject, however, to Jensen–McLean's executing

---

7. A draft of the broker agreement, whereby Crouthamel was to produce and Jensen–McLean was to sell the canned chips overseas, was composed in June, 1979, but a final agreement was never signed by the parties although they generally adhered to the terms of the June draft.

8. While Crouthamel did. obtain advice from Philadelphia counsel with respect to the steps necessary for compliance with the securities laws, it failed to act on that advice.

9. The Bankruptcy Code became effective on October 1, 1979. The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2683 (1978).

and delivering to Crouthamel an option to purchase the equipment. Crouthamel further contends that, since Jensen–McLean never delivered the option to Crouthamel, the assignment by it to Jensen–McLean never became effective.

We cannot agree with Crouthamel's contention for two reasons: first, we do not find that the parties agreed that Jensen–McLean was to execute and deliver the option before the assignment from Crouthamel to Jensen–McLean was to be effective, and second, even if that was their agreement, Jensen–McLean did sufficiently comply with that requirement and, furthermore, Crouthamel excused any failure to comply by Jensen–McLean.

■ From the testimony presented we conclude that the agreement of the parties was that Crouthamel would act as Jensen–McLean's agent and, using Jensen Mc-Lean's money, would purchase the equipment for Jensen–McLean. An agent is defined as "one who undertakes to transact some business, or to manage some affair, for another, by the authority and on account of the latter, and to render an account of it." [10] Therefore, being an agent of Jensen–McLean for the purpose of buying the equipment for it, Crouthamel was required to make an accounting of that property by assigning it to Jensen–McLean as agreed.

■ There is no evidence that the parties agreed that the assignment to Jensen–McLean was to be contingent on Jensen–McLean's execution and delivery of the option. In fact, there does not appear to have been any discussion of an option by the parties prior to the closing. At that time they only agreed that Crouthamel would buy the equipment as agent for Jensen–McLean and that the details of any stock sale and future transfer of title to the equipment from Jensen–McLean to Crouthamel would be worked out later. Further, an option was only first drafted by Crouthamel's attorney after he received the bill of sale from escrow, and the final draft was worked out much later in telephone conversations between Brooke Nelson and Anthony Mazullo. Therefore, we conclude that the parties did not agree that the assignment of the bill of sale from Crouthamel to Jensen–McLean was to be contingent on the execution and delivery of the option by Jensen–McLean.

■ Further, even if we were to find that that was what the parties had agreed, we would find that Jensen–McLean had complied with that requirement. Crouthamel argues that Jensen–McLean did not comply because it failed to send the executed option back to Crouthamel. However, the letter from Crouthamel to Jensen–McLean in which the option was enclosed only requested that Jensen–McLean return the option at its convenience,[11] and both John Crouthamel and Anthony Mazullo admitted that they never requested that Jensen–McLean return the option. Also, Anthony Mazullo testified that, in his telephone conversations with Brooke Nelson, he was told that the option agreement was acceptable to Jensen–McLean. Therefore, we find that Jensen–McLean sufficiently communicated its acceptance of the form of the option to Crouthamel. In addition, Crouthamel, by failing to demand that the executed option be returned, waived its right to complain that Jensen–McLean had failed to do so.

■ Crouthamel also contends that if the assignment of title to the can line equipment from it to Jensen–McLean was effective, it was nevertheless a voidable preference under section 547(b) of the Code. That section provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

---

10. Black's Law Dictionary 59 (5th ed. 1979). *See also*, Restatement (Second) of Agency § 1 (1958).

11. *See* Plaintiff's Exhibit P–8.

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Nor do we agree with Crouthamel's contention that the transfer of title to the equipment from it to Jensen–McLean was a voidable preference. It has been consistently held that where there exists a true agency relationship, such as a bailment, a transfer by the agent of agency property to the principal is not a voidable preference. *See generally,* 4 Collier on Bankruptcy ¶ 547.08 at 547–31 (15th ed. 1980); 3 Part 2 Collier on Bankruptcy ¶ 60.44 (14th ed. 1977). The reason is that the transfer is not of property of the debtor but of property of the principal. *Id. See also,* 4A Collier on Bankruptcy ¶ 70.18[4] at 199–200 (14th ed. 1977) which, in a discussion of the trustee's title to property held by a bankrupt, states:

[A] bailment is nothing more than a delivery of goods for some purpose, upon a contract express or implied, to be redelivered to the bailor upon fulfillment of the purpose or to be dealt with according to the bailor's direction. Similarly, an agency is a relationship arising from a con-

tract, express or implied, by which one of the parties confides to the other the transaction or management of some business or other activity in his name, or on his behalf, and whereby the other party assumes so to act and to render an account thereof. Thus in both situations, the title to the property remains in the bailor or principal, and the bailee or the agent holds the property under the bailment or agency for the owner's benefit. Consequently, it is well settled that absent state statutory enactment to the contrary, if property is in a bankrupt's hands as bailee or agent, the trustee holds it as such, and the bailor or principal may recover the property or its proceeds.

Since, as we have found above, the relationship between Jensen–McLean and Crouthamel was one of principal and agent with respect to the can line equipment, the transfer of title to that equipment by Crouthamel to Jensen–McLean was not the transfer of property of the debtor, Crouthamel.

In addition, we would be unable to find that the transfer herein was a voidable preference even without the agency question because there was insufficient proof that Wally Nelson was an insider[12] at the time of the transfer and had reasonable cause to believe that Crouthamel was insolvent at that time. Wally Nelson did not become a director of Crouthamel until June 21, 1979, and the transfer occurred, at the latest, on June 18, 1979, when the executed assignment of the bill of sale was sent to Jensen–McLean. Further, we find that Wally Nelson did not see any of the books or financial records of Crouthamel except for the financial statement for the year ending September 3, 1978, which showed Crouthamel to be solvent as of that date.[13]

Therefore, we conclude that the transfer of title to the can line equipment by Crouthamel to Jensen–McLean was not a voidable preference.

12. Section 101(25) defines insider to include a director of the debtor corporation. 11 U.S.C. § 101(25).

13. Section 101(26) defined "insolvent" to mean the "financial condition such that the sum of such entity's debts is greater than all of such

entity's property." 11 U.S.C. § 101(26). The financial statement shown to Wally Nelson showed that Crouthamel's total assets exceeded its total debts as of September 3, 1978. *See* Defendant's exhibit D–17.

Crouthamel argues further, however, that if Jensen–McLean has title to the can line equipment it should be required to transfer that title back to Crouthamel and pay an additional $100,000 to Crouthamel in exchange for 20% of Crouthamel's stock pursuant to their agreement. From a reading of the evidence presented, we do not agree with Crouthamel's contention.

■ Although the initial agreement of the parties was to have such a stock sale, the parties decided not to proceed with it after Crouthamel's attorney informed them that such an agreement would be illegal. The final agreement of the parties was that Crouthamel would act as Jensen–McLean's agent in purchasing the can line equipment and that later, after compliance with the securities laws, the parties would make some agreement about the stock sale. Since, according to the uncontradicted testimony Crouthamel and Anthony Mazullo, Crouthamel never took any of the steps necessary for compliance with the securities laws, Jensen–McLean never became obligated to purchase any of Crouthamel's stock.

Consequently, Crouthamel is not entitled to an order directing Jensen–McLean to pay it $100,000 and to transfer title to the equipment to Crouthamel.

2. Rights in the can line equipment of Jensen–McLean versus Westinghouse.

The issue presented by Westinghouse's intervention is whether Crouthamel ever had a sufficient interest in the can line equipment to enable the security interest of Westinghouse in Crouthamel's after-acquired equipment to attach. Section 9–204 of the Uniform Commercial Code ("the U.C.C.")[14] provides that: "A security interest cannot attach until ... the debtor has rights in the collateral." The U.C.C. does not define what the rights are that a debtor must have in the collateral before a security interest can attach; however, section 1–103

of the U.C.C. provides that, "Unless displaced by the particular provisions of this Act, the principles of law and equity, including ... principal and agent ... shall supplement its provisions". Although certain provisions of the U.C.C. do change the law with respect to some agency problems, namely consignment sales[15] and entrusting goods to a merchant who deals in goods of that kind,[16] there is no provision of the U.C.C. which alters the rule that in an agency relationship such as the one in the instant case the principal retains all title to the property.

■ In accord with this, several courts have held that an agent does not have a sufficient interest in the agency property to grant a security interest therein. *See e. g., In re Toppo,* 474 F.Supp. 48 (W.D.Pa.1979) (held a mobile home dealer who acted as a party's agent in selling certain mobile homes had no interest in those mobile homes in which to grant a security interest); *Cattle Owners Corporation v. Arkin,* 252 F.Supp. 34 (S.D.Iowa 1966) (held debtor corporation which acted as agent for cattle owners in purchasing and placing cattle had no interest in those cattle, consequently the corporation's trustee in bankruptcy and creditors had no interest in the cattle); *Air Traffic Conference v. Downtown Travel Center, Inc.,* 18 U.C.C. Rptg. Serv. 1202 (N.Y.Sup.Ct.1976) (held a travel agent had no interest in proceeds of the sale of tickets it sold for airlines and could, thus, grant no security interest in those proceeds); *First National Bank & Trust Company v. Jim Payne Pontiac GMC, Inc.,* 20 U.C.C. Rptg. Serv. 768 (Okl.Ct.App.1976) (held a used car dealer who acted as purchasing agent for another car dealer had no interest in cars it purchased for that other dealer and could not grant a security interest therein); *National Livestock Credit Corporation v. First State Bank of Harrah,* 11 U.C.C. Rptg. Serv. 661 (Okl.Ct.App.1972) (held feed lot operator had no interest in cattle it bought

---

**14.** Pa.Stat.Ann. tit. 12A § 9–204 (Purdon 1970).

**15.** *See* U.C.C. § 2–326(2), Pa.Stat.Ann. tit. 12A § 2–326(2) (Purdon 1970).

**16.** *See* U.C.C. § 2–403(2), Pa.Stat.Ann. tit. 12A § 2–403(2) (Purdon 1970).

as agent for third parties and the security interest in its after–acquired property held by a creditor did not attach to those cattle); *Texas State Bank v. Foremost Insurance Company*, 10 U.C.C. Rptg. Serv. 899 (Tex. Ct.App.1972) (held mobile home dealer had no interest in mobile home left with him by owner to sell and could grant no security interest therein). *Cf. In re Medomak Canning Company*, 25 U.C.C. Rptg. Serv. 437 (D.Me.1977) (held owner did not part with any interest in materials it provided to canning company for processing and, thus, creditors of canning company had no rights therein); *Cain v. Country Club Delicatessen, Inc.*, 2 U.C.C. Rptg. Serv. 247 (Conn.Super.Ct.1964) (held that mere possession of goods by buyer prior to making contract of sale did not amount to rights in those goods in which the buyer could grant a security interest). *Compare Poteet v. Winter Garden Production Credit Association*, 21 U.C.C. Rptg. Serv. 645 (Tex.Ct.App.1977) (held secured creditor had security interest in cattle purportedly held by feed lot operator as agent for third parties where operator bought the cattle with his own money and only later segregated the cattle from his own and credited them to the third parties' accounts).

 We conclude, therefore, that there is ample support for the proposition that a secured creditor cannot obtain a security interest in property held by an agent for another. Therefore, since Crouthamel only acted as the agent of Jensen–McLean in purchasing the can line equipment, Westinghouse's security interest in Crouthamel's after–acquired equipment did not attach to the can line equipment.

 Westinghouse argues, nevertheless, that its security interest attached to the equipment because Crouthamel actually acquired legal title to the can line equipment from the Bank before assigning the bill of sale to Jensen–McLean. We do not believe that that is significant, however, because, as we found above, Crouthamel was merely acting as Jensen–McLean's agent in making that purchase. Under the law of agency, an agent merely holds the agency property for the benefit and at the direction of the principal, and the agent is under a duty to dispose of the property only as the principal directs.[17] Consequently, any agency property wrongfully converted by an agent may be recovered by the principal from a purchaser, even a good faith purchaser.[18] The only exception to this rule is where the principal is estopped from denying that his agent had the power to convey the property because the principal has so cloaked the agent with the indicia of ownership that he misled the purchaser into believing that the agent was the true owner of the property.[19]

---

17. *See* Restatement (Second) of Agency §§ 1, 13 & 14 (1958).

18. *See id.* at § 311.

19. In *United States v. Haddix & Sons, Inc.*, 268 F.Supp. 825 (E.D.Mich.1967), *rev'd on other grounds*, 415 F.2d 584 (6th Cir. 1969), the United States District Court stated:

> Normally, of course, no one can convey what is not his. The doctrine applies generally to bailees who, having no proprietary rights in the stored goods, can transfer none. . . . On the other hand, it is universally admitted that an owner who has even implicitly left the impression that another has authority to sell cannot deny that good title passed to a bona fide purchaser who acted in accordance with his representation.

268 F.Supp. at 833 (citations omitted).

Similarly, in *Toyomenka, Inc. v. Mount Hope Finishing Co.*, 432 F.2d 722 (4th Cir. 1970), the United States Court of Appeals for the Fourth Circuit stated:

> As bailee, the authority of Wilmington was limited strictly by the terms of the agreement whereby it obtained possession of the bailor's property. . . . Except as authorized by its instructions, it had no authority to sell, transfer or give away the goods of its bailor, Toyomenka. Nor can any negligent act or error of the bailee (Wilmington) be imputed to the bailor (Toyomenka). In the absence of grounds for an estoppel and except as provided in Sections 2–403(2) or 2–401 of the Uniform Commercial Code, as adopted in North Carolina, "No right, title or interest may be acquired as the result of an unauthorized or wrongful sale, gift, exchange, pledge, mortgage, or other transfer of property by a bailee in possession, even though to an innocent purchaser. The bailor is not divested of his title by such an unauthorized act and may recover the property or its value from the

In the instant case, Westinghouse cannot argue that it was misled by the fact that Crouthamel held the legal title to the equipment for some time because Westinghouse acquired its security interest long before Crouthamel became Jensen–McLean's agent in purchasing that equipment. Therefore, Jensen–McLean is not estopped from asserting that Crouthamel had no authority to grant a security interest in the equipment and that, therefore, Westinghouse has no interest in that equipment.

Consequently, we conclude that Crouthamel acted merely as Jensen–McLean's agent in purchasing the can line equipment from the Bank and, therefore, Crouthamel did not have sufficient rights in that equipment to allow the security interest of Westinghouse to attach thereto. Thus, Jensen–McLean owns the can line equipment free of any interest in that equipment of Westinghouse or Crouthamel.

vendee or transferee in any appropriate form of action." ... To create an estoppel against bailor, the bailor (Toyomenko) itself, however, must have done more than entrust possession to its bailee, it must have done something to mislead the transferee (Mount Hope) to the latter's prejudice.
432 F.2d at 729 (citations omitted).