415 F.2d 584
 UNITED STATES of America, Plaintiff-Appellant,
George S. McIntyre, State Director, Department of Agriculture, Plaintiff, National Bank of Detroit, Plaintiff-Appellee,
v.
HADDIX & SONS, INC., and Haddix & Sons Elevators, Inc., Defendants.
 No. 18782.
 United States Court of Appeals Sixth Circuit.
 August 14, 1969.
 
 Stephen R. Felson, Atty., Dept. of Justice, Washington, D. C., for appellant; Edwin L. Weisl, Jr., Asst. Atty. Gen., John C. Eldridge, Atty., Dept. of Justice, Washington, D. C., Lawrence Gubow, U. S. Atty., Detroit, Mich., on brief.
 Patrick J. Ledwidge, Detroit, Mich., for appellee; George B. Martin, Jr., Detroit, Mich., on brief; Dickinson, Wright, McKean & Cudlip, Detroit, Mich., of counsel.
 Before O'SULLIVAN, EDWARDS and PECK, Circuit Judges.
 O'SULLIVAN, Circuit Judge.
 
 
 1
 The United States appeals from judgment entered in the United States District Court for the Eastern District of Michigan at Detroit which directed that Commodity Credit Corporation (referred to herein as Commodity), an agency of the United States, pay to the National Bank of Detroit $96,117.01 to satisfy the unpaid balance of a chattel mortgage purporting to cover grain that had been stored in a warehouse of a mortgagor, Haddix & Sons Elevators, Inc.[1] Upon discovery of defalcations and the insolvency of Haddix, the receivership proceedings in which the appealed judgment was entered were instituted.
 
 
 2
 Haddix owned several grain elevators in Michigan, devoted chiefly to storage of grain acquired by Commodity as part of the national government's program of price support for agricultural products. During this program, Commodity had acquired a large amount of corn stored in elevators around the country and, in 1961, the government decided to reduce the very large amount so held in storage. This operation moved swiftly, with the government issuing to warehouse operators what were called "load-out" orders directing them to ship to Commodity a specified number of bushels of corn or, in the alternative, to purchase such corn from Commodity at offered prices. In most instances, the warehousemen bought the corn and sold it on the open market. The fast moving program resulted in a very great reduction in the amount of corn theretofore held in storage. It is a fair inference that there were not a few warehousemen who were found to be short of the amount of corn called for by outstanding warehouse receipts. This was true of the Haddix elevator at Monroe, Michigan. It was stipulated that neither the Bank nor Commodity were aware of the Haddix shortages at the time of the transaction here involved.
 
 
 3
 Sometime prior to May, 1962, Haddix had received a "load-out" order from Commodity directing Haddix to ship to it 102,000 bushels of corn or purchase that amount from Commodity at a quoted price. Thereafter Haddix obtained an order from Ralston Purina Company to purchase 102,000 bushels at a profitable price. Haddix did not have enough money to purchase the corn needed to fill the Ralston order. On May 14, 1962, it borrowed $100,000 from appellee National Bank of Detroit for that purpose. Haddix gave the Bank its promissory note in that amount, secured by a chattel mortgage purporting to encumber 102,000 bushels of the corn then in the Monroe elevator. The Bank also obtained an assignment of whatever accounts receivable would accrue to Haddix from deliveries to the Purina Company.
 
 
 4
 The loan proceeds were deposited in the Haddix bank account and two checks on this account totalling $102,879.28 were drawn to the order of, and were delivered to, Commodity in payment for 102,000 bushels of corn. Warehouse receipts representing 102,000 bushels of the corn which had been stored in the Monroe warehouse by Commodity were surrendered to Haddix. No question is involved as to the proper execution and recording of the involved chattel mortgage. A small amount of the corn contracted to be sold to Purina was delivered and paid for prior to the institution of the receivership, leaving $96,177.01 unpaid on the bank's note and chattel mortgage when the receivership proceeding was commenced in the District Court on July 16, 1962.
 
 
 5
 Since most of the corn remaining in the Monroe warehouse unquestionably belonged to Commodity, the receiver forwarded all of it to that agency upon the government's promise to indemnify anyone who could be shown to have a prior interest in it. As of July 16, 1962, the corn shortages at Monroe totaled at least 220,000 bushels. Haddix is hopelessly insolvent. This shortage of corn is not questioned.
 
 
 6
 The bank claims that the balance due on its chattel mortgage — $96,177.01 — represents a claim that should be paid out of the receivership before any satisfaction is made to Commodity as owner of the corn remaining in the warehouse. Alternatively, the Bank asserts that it should ratably share in the total receivership fund in the proportion that 102,000 bushels of corn bears to the total amount of corn called for by the warehouse receipts outstanding in the hands of the Commodity Credit Corporation.
 
 
 7
 Opposing these contentions is the government's claim that by virtue of Sections 8 and 13 of the Michigan Farm Produce Storage Act, M.S.A. §§ 12.119(8) and (13), Compiled Laws of Michigan, 1948 §§ 285.68 and 285.73, and its possession of warehouse receipts for more corn than remained in the warehouse it is entitled to the ownership or proceeds of all such corn to the exclusion of the Bank's claim as a chattel mortgagee. This was the contest before the District Judge. He resolved it in favor of the Bank, ordering Commodity to pay in full the unpaid balance of its chattel mortgage. His conclusions were supported by strong arguments set out in his well-considered opinion, reported as United States v. Haddix & Sons, Inc., 268 F.Supp. 825 (E.D.Mich. 1967). We are constrained to reverse. We order that the Bank's cause be dismissed and its claim denied.
 
 
 8
 The District Judge, viewing the case before him as one in equity, found the Bank's position of greater appeal to him as a chancellor and, notwithstanding the literal context of the Michigan statute, construed it to allow the equitable relief provided in his order.
 
 
 9
 The relevant statutes are Sections 8 and 13 of the Michigan Farm Produce Storage Act. Section 8, M.S.A. § 12.119(8), provides:
 
 
 10
 "Acceptance of farm produce for storage by any warehouseman for which a warehouse receipt is issued shall be a bailment and not a sale, and in no case shall the farm produce so stored be liable to seizure upon any process of any court in any action against such bailee, except upon action by owners of such warehouse receipts to enforce the terms thereof, but such farm produce shall at all times, in the event of the failure or insolvency of such bailee, be first applied exclusively to the redemption of outstanding storage receipts for farm produce so stored with such bailee, and in such event, farm produce on hand in any particular warehouse of the bailee shall be first applied to the redemption and satisfaction of the warehouse receipts issued by said warehouseman as the bailee." (Emphasis supplied.)
 
 
 11
 Section 13, M.S.A. § 12.119(13), provides:
 
 
 12
 "If authorized by agreement or custom, warehousemen may commingle fungible farm produce with other farm produce of like kind and grade. In such case, the various depositors of the mingled goods shall own the entire mass in common, and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole, and the warehouseman shall be liable, severally, to each depositor for the care and redelivery of his share of such mass to the same extent and under the same circumstances as if the goods had been kept separate, and a warehouseman may dispose of only that quantity of any part of any fungible mass of farm produce that shall be in excess of the amount covered by any outstanding warehouse receipts issued by him." (Emphasis supplied.)
 
 
 13
 It is undisputed that at the time Haddix obtained the $100,000 loan from the Bank and gave the chattel mortgage, the corn in the warehouse — including the 102,000 bushels purchased by Haddix — was substantially less than the bushels represented by warehouse receipts still held by Commodity. This was so at the beginning of the transaction, at the instant that Haddix delivered the chattel mortgage, and at all times thereafter. It is clear, also, that Haddix was then insolvent.[2] We hold then that even though title to the 102,000 bushels was transferred from Commodity to Haddix by Commodity's surrender of warehouse receipts for that amount, Haddix' right to sell or encumber what he had purchased was immediately subjected to the restrictions of the quoted sections of the Michigan Farm Produce Storage Act. Haddix had no corn that he could then mortgage to the bank free from the superior right of the holder of warehouse receipts.
 
 
 14
 It is argued here that to let the government keep the $100,000 which Haddix had borrowed from the bank and paid to Commodity and still claim ownership of the 102,000 bushels of corn which was the purported subject of the sale, would offend equity. We must, however, be aware that Commodity received no more than it was entitled to when it gave up warehouse receipts for 102,000 bushels. The fact that Haddix was short at the time receivership was instituted was no fault of Commodity's.
 
 
 15
 A stipulation of facts disclosed that at the time the Bank's loan was negotiated, the warehouse receipts issued by Haddix called for the Monroe elevator to contain approximately 370,000 bushels of corn and that Commodity was the owner of substantially all of such receipts. However, the Haddix elevator was short approximately 195,000 bushels so that Haddix' payment for 102,000 bushels left Commodity with a deficit of about 93,000 bushels. Accordingly, there was no time during the period here involved at which Haddix had any corn which he was free to dispose of or encumber with a mortgage that would take priority over the warehouse receipt holder. That the prohibition against disposing of grain applies to mortgages is made clear by Section 22 of the Act, M.S.A. § 12.119(22), which makes it a crime not only to sell, but "while any valid receipt is outstanding" to "pledge, mortgage or encumber" the commodities covered by a warehouse receipt contrary to the Act. And, Section 13 of the Act clearly provides that:
 
 
 16
 "a warehouseman may dispose of only that quantity of any part of any fungible mass of farm produce that shall be in excess of the amount covered by any outstanding warehouse receipts issued by him." (Emphasis supplied)
 
 
 17
 No such excess — available for disposition — existed before or after Haddix made the transaction here involved.
 
 
 18
 We consider that the following statements in the government's brief to this Court are correct and succinct statements of the legal situation:
 
 
 19
 "The validity of the mortgage from the warehouseman to the Bank is, of course, governed by state law. Michigan statutes regulating the conduct of warehousemen flatly prohibit any transfer of commingled grain by a short warehouseman. Stated another way, they only permit him to dispose of grain to the extent that the amount of grain actually in the warehouse exceeds the outstanding warehouse receipts.
 
 
 20
 "Since, in the instant case, the warehouseman was still at least 93,000 bushels short after he purchased the 100,000 bushels from Commodity (he was at least 195,000 bushels short before the purchase), he never obtained the right to transfer this corn. Therefore, his mortgage to the Bank was ineffective to give the Bank any interest whatsoever."
 
 
 21
 The District Judge appears to concede that under the literal language of the mentioned sections 8 and 13 of the Michigan Farm Produce Storage Act, the government's position is sound. The judge's critical and careful analysis of the statute's language leads him to the conclusion that the legislature did not desire a literal reading of the statute.[3] With great respect for this careful analysis and the strong reasoning employed to support it, we are unable to join the District Judge in supplying a construction of the statute not expressed by its words. The language is plain and we find no reason to conclude that it does not express the legislature's intent.
 
 
 22
 Considering that the Bank urges that equitable principles ought to be applied, it should be made clear that Commodity's position is no less appealing than that of the farmers who delivered the corn to the Monroe elevator. The mechanics of the price support program were stipulated as follows:
 
 
 23
 "Producers of corn (i. e. farmers) would take corn to the warehouses and deposit the same, receiving a warehouse receipt therefor. The producers would then take the receipt to the County A.S.C.S. office of the Department of Agriculture of the United States and hypothecate it and the corn it represented to Commodity for a loan which Commodity made to the producer, which loan would be based upon the official price support value of the corn. Harvest of corn begins at about October of every year so that the bulk of the corn which goes into warehouses (including the Haddix warehouse) flows into the warehouses during October, November and December.
 
 
 24
 "The corn loans made must either be repaid or the collateral forfeited by August 1 of the following year. If the producer decides not to repay the loan, on such August 1, the warehouse receipt and the corn become the property of Commodity and the producer is relieved of his obligation to pay the loan."
 
 
 25
 It can be assumed that the warehouse receipts representing corn in the Monroe elevator became the property of Commodity after the depositing farmers had failed to repay the monies advanced by Commodity. The Bank and Commodity have each paid out money on the assumption that they were acquiring title to, or a lien upon, corn in the Monroe elevator. They have equal appeal to equity, but equity may not, in the service of its equitable desire, wipe out rights that have become fixed by statute. In a case where the Ninth Circuit recognized the propriety of equitable and ratable sharing in proceeds of an assignee's sale of the contents of a warehouse which was grossly short of flour to meet all outstanding warehouse receipts, the Court in McDonnell v. Bank of China, 33 F.2d 816 (9th Cir. 1929), made clear that equity cannot wipe out statutory rights:
 
 
 26
 "[I]n the absence of some statute giving a priority of right to the holder of warehouse receipts, we are of the opinion that the several claimants stand on an equal footing in a court of equity * * *." 33 F.2d at 819. (Emphasis supplied.)
 
 
 27
 There is no contention nor did the District Judge find, that Commodity was in any way responsible for the Bank loaning $100,000 to Haddix. The warehousemen, not Commodity, had represented that he had good title to 102,000 bushels of corn to stand as security for the loan. Neither the Bank nor Commodity was aware of the misconduct of Haddix, which was the sole cause of the loss which the Bank suffered. The Bank did not make such an investigation as would assure it that Haddix was legally in position to provide the security he offered. The cause of the loss to the Bank as well as to Commodity was the fault of Haddix. To enforce a relevant Michigan statute of clear import, designed to protect the holders of warehouse receipts, does not in the facts of this case offend equity.
 
 
 28
 No Michigan case has ever construed the Michigan statute as it affects the case at bar. What cases from other states bear on the question support the position we take. See Hall v. Pillsbury, 43 Minn. 33, 44 N.W. 673, 7 L.R.A. 529 (1890); Central States Corp. v. Luther, 215 F.2d 38 (10th Cir. 1954), cert. denied, 348 U.S. 951, 75 S.Ct. 438, 99 L. Ed. 743. What we have said is dispositive of the Bank's alternative position that it should at least share in the receivership fund in the proportion of its claim to the total claims against Haddix. We hold that it does not have such right.
 
 
 29
 The case is reversed with direction to deny the Bank's claim and dismiss its complaint.
 
 
 
 Notes:
 
 
 [1]
 Haddix & Sons, Inc., and Haddix & Sons Elevators, Inc., together were the owners and operators of various grain elevators in Michigan and it was agreed that they can be treated together and will herein be referred to as Haddix or the warehouse operators
 
 
 [2]
 Of the situation existing when the loan was authorized, the District Judge said:
 "Bud Haddix [who negotiated the deal] neglected to inform Mr. Anderson [the bank's representative] that the agency had commenced a massive load-out program, that Haddix was insolvent, and most important, that the firm had been converting the Government's corn with the result that on the day the advance was approved, Monroe was short at least 195,000 bushels. The bank did not stand alone in the dark; Commodity had no knowledge of the conversions." 268 F.Supp. at 830.
 
 
 [3]
 The District Judge states: "The court would be willing to join in this strict reading of the controversial language were it not obvious that the legislature did not desire a literal construction." 268 F.Supp. at 831