No. 72,146

BEVERLY J. RICE, *Appellee/Cross-appellant,* v. JANET S. GARRISON, KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM, and THE SECURITY BENEFIT GROUP/SECURITY BENEFIT LIFE INSURANCE COMPANY, *Appellants/Cross-appellees.*
(898 P.2d 631)

Opinion filed July 14, 1995.

*Arthur A. Glassman,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause, and *R. Scott Seifert,* of the same firm, was with him on the brief for appellee/cross-appellant.

*Bruce C. Harrington,* of Topeka, argued the cause and was on the brief for appellant/cross-appellee Janet S. Garrison.

*David C. Wetzler,* of Bennett, Lytle, Wetzler, Martin & Pishny, L.C., of Prairie Village, was on the briefs for appellant/cross-appellee Kansas Public Employees Retirement System.

The opinion of the court was delivered by

MCFARLAND, J.: This is a declaratory judgment action brought by the surviving spouse of a deceased state employee seeking a determination that she is the owner of certain pension benefits and life insurance proceeds, notwithstanding the fact the decedent's former wife is the designated beneficiary thereof. The district court, on equitable principles of unjust enrichment, established a

constructive trust in favor of the surviving spouse on the bulk of the proceeds. Alternatively, the district court held that the Kansas Public Employees Retirement System (KPERS) benefits were subject to the widow's right of election under K.S.A. 59-602 (Ensley); throughout this opinion the Ensley version of chapter 59 will be the applicable version. Appeals and cross-appeals have been filed by the various parties hereto from those portions of the judgment adverse to their respective positions.

The evidence presented at trial essentially falls into one of two categories, which shall be characterized as relating to "events," or as relating to oral statements made by the deceased Dale A. Rice. There is no claim by the widow nor did the trial court find that the events facts, alone, provide any grounds for the invalidization of the deceased's designation of his beneficiary.

The events facts are uncontroverted and are summarized as follows. Janet Sue Custenborder and Dale were married on May 18, 1957. Between January 1958 and November 1963, six children were born to the marriage. At some point, both Janet and Dale became dissatisfied with the marriage but opted to stick it out until all of their children had become adults.

Dale was employed at the Kansas Division of Printing from August 21, 1972, until May 21, 1982, when he terminated his employment and withdrew his KPERS pension contributions. In September 1982, Janet filed for a divorce which was granted in January 1983. Dale was involved with plaintiff Beverly J. Kinnett (now Rice) at the time, and Janet, also, was seeing someone else. All marital assets were divided pursuant to a property settlement agreement and no order of support was entered. Sometime in the spring of 1983 Dale and the plaintiff began living together. Dale was approximately 18 years older than Beverly.

In September 1983, Dale resumed his employment with the state printer. He had debts from an abortive entry into the trucking business. Upon resuming his state employment, Dale executed a KPERS enrollment application. He designated Janet Sue Custenborder "ex-wife" as his beneficiary. At the time of his reemployment Dale applied for $50,000 life insurance through the Kansas Public Employees Retirement System Optional Group Life Insur-

ance. As a state employee under KPERS, Dale received automatically, at no cost to him, a basic group life insurance policy in an amount equal to one and one-half times his annual salary. The life insurance program was administered by KPERS, but the actual insurer was defendant Security Benefit Life Insurance Company (SBL).

The application form for the optional life insurance provided, in pertinent part:

"The beneficiary for this plan will be the same as your beneficiary for the KPERS basic group life insurance plan. If the named beneficiary does not survive the insured, then the proceeds payable shall be paid in accordance with K.S.A. 74-4902(7)."

Both the basic group life and the optional group life insurance are term insurance with no cash value and payable only on the death of the insured. SBL has no contact with the insured. Once optional group life insurance is approved, KPERS issues an insurance certificate to be delivered to the insured. KPERS does not keep copies thereof. The certificate was not located in Dale's possessions after his death. There is no record of its actual delivery to Dale.

On November 13, 1984, Beverly and Dale were married. On September 12, 1985, Dale applied for an additional $50,000 of optional life insurance. This was approved, thereby giving Dale $100,000 of such insurance. Payment for optional life insurance is through payroll deductions.

In October 1986, Dale enrolled in a public employees deferred compensation plan issued in conjunction with Aetna Life Insurance and Annuity Company. Beverly was designated by Dale as his beneficiary. Proceeds of $11,000 therefrom were received by Beverly and are not at issue herein.

In the fall of 1988, Dale and Beverly applied for a loan to provide funds to build a home on land they owned in Auburn. On their loan application they listed total life insurance in the aggregate amount of $130,000. The life insurance was stated to have a cash value of $25,000. Dale's insurance at issue was term insurance with no cash value.

On September 19, 1989, Beverly purchased optional group term life insurance through her employer, designating Dale as her beneficiary.

On September 27, 1989, Dale applied for additional insurance. In all relevant parts, the application form was the same as the first application for optional life insurance. The application was approved by SBL. Effective January 1, 1990, Dale had a total of $200,000 optional life insurance provided through the KPERS optional life insurance plan underwritten by SBL.

The specimen copies of the insurance certificates for the optional insurance provide:

"BENEFICIARY—Payment of any Optional Group Life Insurance under this provision on account of the death of an Insured shall be made in the same manner and to the same Beneficiary as the proceeds under the Certificate to which this provision is attached."

The Basic Group Life Insurance Certificate states that death benefits will be paid to the person or persons designated as the beneficiary designated on the KPERS form. If no person is designated or if the designated beneficiary does not survive the KPERS employee, the proceeds are paid as specified in K.S.A. 74-4902(7).

Effective on the first anniversary of his reemployment, as per statute, monthly deductions of Dale's KPERS retirement contributions began. An employee may change his beneficiary designation at any time. Dale did not do so. Janet Custenborder, Dale's ex-wife, continued to be his designated beneficiary. A KPERS eligible employee cannot designate one beneficiary for pension benefits and another for life insurance. All KPERS benefits, whether pension, basic life insurance, or optional group life insurance must carry the same beneficiary designation.

Each year KPERS-eligible employees receive an annual statement of benefits on which, in the upper left-hand corner, is prominently displayed the name or names of the employee's designated beneficiary or co-beneficiaries. There was no testimony that Dale actually received or did not receive these annual statements. Beverly testified she never saw any such form.

One of Dale's six children, Derrick, has a severe hearing disability and is a schizophrenic. Although Derrick received federal and state disability payments and did not live with either parent, both parents assisted him financially and in securing necessary medical treatment. Derrick's future was an ongoing concern of Dale and of other family members.

After leaving his state employment, Dale engaged in the trucking business. He went into debt. Beverly assisted in the payment of these debts and often worked two jobs. Beverly was the couple's money manager and wrote most of the checks. During the marriage the couple shared a joint bank account and filed joint tax returns with Beverly being responsible for the preparation of the annual tax returns.

Dale died suddenly of a massive heart attack on December 2, 1991. He was 55 years old at his death with no history of heart disease. He died intestate. At Dale's death the following were available through KPERS for distribution:

| | |
|---|---|
| 1. Basic Group Life Insurance | $ 52,200.00 |
| 2. Optional Group Life Insurance | $200,000.00 |
| 3. Accumulated Pension Contributions | $ 17,058.94 |

Janet Custenborder was the designated beneficiary of all such proceeds.

We now turn to the oral statements upon which Beverly relied, and which the district court found warranted the granting of equitable relief, invalidating Dale's legally executed designation of beneficiary form. The district court found each of Dale's statements admissible under either K.S.A. 60-460(d)(3) or (l)(1). No complaint is made as to this determination.

The testimony at trial reflected that Dale discussed his life insurance with an amazingly large number of people, including friends, relatives, coworkers, and others. In virtually all of the conversations, Dale initiated the topic of his insurance. Beverly, and many of the individuals she called as witnesses, testified to various oral statements Dale had made to the effect he had taken out the optional life insurance so that Beverly would be taken care of and/or so that she would be able to keep their home if something hap-

pened to him. Beverly also testified that Dale wanted her to treat his children "fairly" and give them an unspecified part of his life insurance proceeds.

Janet presented the testimony of herself and certain of her children that Dale made oral statements that Janet was his beneficiary on all state benefits and that Beverly would have the house. One of Dale's daughters testified that Beverly overheard one of these conversations, expressed anger over its content, but acknowledged she was aware that Janet was the named beneficiary of the state benefits.

Beverly testified she did not know Janet was the designated beneficiary. Thus, the only controverted testimony is that of the daughter relative to Beverly's knowledge. The conversation, involving the daughter, Dale, and Beverly, is the only confrontational conversation in evidence. Put another way, it is the only instance where Dale is alleged to have made statements relative to the beneficiary of his life insurance which displeased the object of the statement and evoked a disapproving reaction. There was also testimony that Dale had made statements that he had left life insurance to his children.

The district court bifurcated its decision herein. On August 25, 1993, the district court held that all three categories of KPERS benefits at issue were subject to the plaintiff widow's right of election under K.S.A. 59-602. KPERS and Janet appeal therefrom. On May 23, 1994, the district court entered its final order disposing of the remaining issues. Specifically, the district court held:

"Hence, the Court adopts the previous findings made in the memorandum decision of August 25, 1993. However, the ruling of this order creating a constructive trust controls. It is therefore the order of this Court that a constructive trust should be imposed upon the KPERS accumulated contributions of $17,058.94 and all of the SBL optional life insurance benefits paid for by Dale A. Rice which amount to $200,000.00. Under the terms of this trust, KPERS and SBL shall pay the proceeds to Beverly J. Rice. No constructive trust shall be imposed upon the basic group life insurance paid by Dale A. Rice's employer. The $52,200.00 of basic group life insurance should be paid to the designated beneficiary, Janet Garrison."

KPERS and Janet appeal from the district court's finding of unjust enrichment and imposition of the constructive trust of the two

categories of benefits and the court's application of K.S.A. 59-602. Beverly appeals from the district court's refusal to include the basic group life insurance proceeds in the constructive trust.

Inasmuch as the district court held its later order controlled over the earlier order, we shall first consider the issues arising thereunder.

The district court's rationale was as follows:

"Conclusions of Law

"In support of her claim that she is entitled to all KPERS benefits (including life insurance benefits through SBL), Beverly J. Rice has advanced several theories. Many have been discussed in previous orders. However, there has been no previous ruling on the theory of recovery in which Beverly J. Rice urges the imposition of a constructive trust or application of the unjust enrichment theory to hold all KPERS benefits in trust for her. In support of her claim, Beverly Rice cites *Hile v. DeVries*, 17 Kan. App. 2d 373, 836 P.2d 1219 (1992). In that case, the deceased, Larry, had executed a property settlement agreement in which he agreed to maintain his daughters as beneficiaries on at least $50,000 of life insurance. The deceased later remarried and named his current wife, Bridget, as the beneficiary. His ex-wife, Judith, sought to impose a constructive trust upon a portion of his life insurance proceeds. The Court of appeals upheld the trust. *Id.* at 374.

"Much of the analysis in *Hile* was whether, under the facts, there had to be fraud before a constructive trust could be imposed. The Court of Appeals determined that because the case involved insurance proceeds, fraud did not have to be established. *Id.* In reaching this decision, the Court of appeals distinguished the holding in *Clester v. Clester*, 90 Kan. 638, 135 P. 996 (1914). In *Clester*, the Court noted:

'It is true that trusts by implication frequently arise in transactions between persons occupying such intimate relationships as that of husband and wife or parent and child, but the mere fact that the transaction is between husband and wife or parent and child, and that no valuable consideration passes, is not sufficient to raise a trust by implication. (*Brown v. Brown*, 62 Kan. 666, 675, 64 P. 599.) There must be fraud, active or constructive, and neither character of fraud will be presumed from the fact alone that the relationship of the parties is such as to suggest that a fiduciary relation may have existed; there must be some betrayal of a confidence reposed or some breach of a duty imposed by such relation. When either of these is shown equity is expressly authorized, under the exceptions stated in section 8, supra, to raise a trust by implication and to enforce it in furtherance of justice and to prevent fraud. (See *Kennedy v. Taylor*, 20 Kan. 558, 561.)'

It is said:

'The test of such a trust is the fiduciary relation and a betrayal of the confidence reposed, or some breach of the duty imposed under it.'

'The existence of the relation, and a subsequent abuse of the confidence bestowed under it for the purpose of acquiring the property, are alone sufficient to authorize the enforcement of the trust.' *Trice v. Comstock*, 121 F. 620, 61 L.R.A. 176, headnote, ¶ 3.)

*Id.* at 641-42.

"As the Supreme Court noted, such cases frequently arise between husbands and wives because of the common recognition of the confidential and fiduciary relationship between such parties. 89 C.J.S. *Trusts* § 151(c)(2). In such a situation, constructive fraud is commonly found.

"One frequently cited case is *Sullivan v. Rooney*, 404 Mass. 160, 533 N.E.2d 1372 (1989). The Massachusetts court imposed a constructive trust on title to a home. The parties had a thirteen or fourteen year relationship during seven of which they had lived together. The parties looked for a home together and reached a joint agreement on the home to purchase. It was titled solely in his name in order to take advantage of some preferential Veteran's Administration financing. The parties lived together in the house for almost three years. The woman worked as a waitress and put all of her earnings and savings into the house, paying for food, household supplies and furniture. The man made the mortgage payments and paid taxes, utilities and insurance on the home. The woman did all of the housework, decorating and entertaining. On several occasions, the man promised to transfer title to joint ownership. The appellate court noted:

'The judge's unchallenged findings of fact demonstrate that there was a fiduciary duty to the plaintiff. Equitable principles impose a constructive trust on property to avoid the unjust enrichment of a party who violates his fiduciary duty and acquires that property at the expense of the person to whom he owed that duty.'

*Id.* at 163. The court noted there had been promises to transfer the title of the property to the woman, she had reasonably relied upon promises to her detriment and another party had become unjustly enriched. Therefore, the appellate court upheld the imposition of the constructive trust.

"This case illustrates how the *Clester* standard can be applied in this case. The Kansas Supreme Court in *Clester* indicates that the fraud may be actual or constructive. 90 Kan. at 641.

'Constructive fraud is a breach of a legal or equitable duty which, irrespective of the moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence and neither actual dishonesty or purpose or intent to deceive is necessary.'

*Loucks v. McCormick*, 198 Kan. 351, 356, 424 P.2d 555 (1967).

"Applying the *Clester* test under the theory of constructive fraud to the facts of this case leads to the conclusion that a constructive trust should be imposed over certain benefits at issue. On several occasions Dale A. Rice made statements

to Beverly J. Rice indicating he had or would provide life insurance sufficient to cover their mortgage and otherwise 'take care of her'. Beverly, in reliance upon these promises, obtained insurance providing the same protection to Dale. In addition, over the years, Beverly worked two jobs so that they could pay off Dale's debts, then obtain their home, and contribute as much as they could afford to Dale's retirement funds so that Dale could realize his dream of an early retirement. Marital funds were utilized to pay for Dale's pension fund and his optional life insurance. The Court does not find that the actions of Dale Rice were intentional, in bad faith or with a purpose to deceive. However, it is not necessary that the Court make such findings under the constructive fraud theory. *Loucks*, 198 Kan. at 356.

"Despite the promises to Beverly that she would be the beneficiary of these funds, and despite her reasonable reliance upon those promises and her work to achieve that joint financial goal, Dale did not fulfill his oral promise and make Beverly the beneficiary of the funds. As a result, Janet Garrison is unjustly enriched. Upon the termination of Janet and Dale's marriage, the parties settled all issues regarding support and property. Dale had no duty to support either Janet or any of his children who were adults.

"The holding in *Hile v. DeVries* defeats the defendants' argument that a constructive trust cannot be imposed when a beneficiary has been designated. Furthermore, the case illustrates that the one who is unjustly enriched need not be the one committing the constructive fraud in order for the trust to be imposed.

"The Court finds that a constructive trust should be imposed upon the KPERS accumulated contributions of $17,058.94 and all of the optional life insurance benefits paid for by Dale A. Rice which amount to $200,000.00. Under the terms of this trust, KPERS and SBL shall pay the proceeds to Beverly J. Rice. No constructive trust shall be imposed upon the basic group life insurance paid by Dale A. Rice's employer. The $52,200 of basic group life insurance should be paid to the designated beneficiary, Janet Garrison. There is no evidence of a promise by Dale A. Rice to designate Beverly as the beneficiary of this portion of the insurance proceeds. Further, since this insurance was paid for by the employer, the same equitable arguments do not arise as arise under the accumulated contributions and optional group life insurance proceeds which were paid for by Dale A. Rice and Beverly J. Rice from joint assets."

The district court went through the unusual facts herein and did not find there were any villains or bad guys. As the court stated, it did "not find that the actions of Dale Rice were intentional, in bad faith or with a purpose to deceive." The district court, understandably, had great empathy for the financial worries which have added to Beverly's bereavement. The court evidently concluded that Beverly had ended up being treated unfairly by Dale and determined to remedy the perceived wrong through its application of equitable

powers. Did the district court err or abuse its discretion in invoking its equitable powers to invalidate Dale's designation of beneficiary? We believe that it did.

A court of equity has broad but not unlimited powers to grant relief. Unlike Zorro or the Scarlet Pimpernel, a court under the guise of exercising its equitable powers may not right what it perceives as a wrong or unfairness absent an adequate equitable basis therefor.

As is stated in 30A C.J.S., Equity § 2, pp. 159-61:

"While a court of equity is a forum for the administration of justice, 'equity' is not synonymous in meaning with 'justice' or 'natural justice,' administered without fixed rules, although the terms have sometimes been so used. On the contrary, equity is a separate but incomplete system of jurisprudence, administered side by side with the common law, having its own fixed precedents and principles, now scarcely more elastic than those of the law. The formalism distinguishing law and equity is largely historical, but the underlying substantive concepts of the two have been retained in large measure.

"Equitable considerations do not clash with positive law and it is not ordinarily permissible to invoke them to unsettle established legal principles. The statutes and laws of the land are as much the law in a court of equity as in any other court.

"However, a court of equity is a court of conscience, and as such not to be shackled by rigid rules of procedure. All rules in equity must necessarily be sufficiently elastic to do equity in the case which may be under consideration. While courts of equity may exercise broad powers in applying equitable principles, their powers are not unlimited and may not be exercised in such a manner as to deprive a person of constitutionally or statutorily protected rights."

The same concept was expressed in *Seguros Banvenez, S.A.* v. *S/S Oliver Drescher*, 761 F.2d 855, 863 (2d. Cir 1985), in the following language:

"Moreover, even where equity jurisdiction exists, it generally is recognized that the equitable remedial powers of the court are not unlimited. *Sixty-seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 199, 92 S. Ct. 1477, 1485, 32 L.Ed.2d 1 (1972) (per curiam). 'A court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law, or even without the authority of law.' *Rees v. City of Watertown*, 86 U.S. 107, 122, 22 L.Ed. 72 (1874). 'It cannot assume control over . . . imperfect obligations, resting upon conscience and moral duty only, unconnected with legal obligations.' *Id.* at 121. An equitable doctrine must of necessity 'comport to and remain compatible with the prevailing legislative intent.' *In re Fulghum Construction Corp.*, 706 F.2d 171, 173 (6th Cir.) (quoting *In re Bell*, 700 F.2d 1053, 1057 (6th Cir. 1983)), *cert.*

*denied,* _____ U.S. _____, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983). 'The plain mandate of the law cannot be set aside because of considerations which may appeal to referee or judge as falling within general principles of equity jurisprudence.' *United States v. Killoren,* 119 F.2d 364, 366 (8th Cir. 1941) (quoting *Southern Bell Telephone & Telegraph Co. v. Caldwell,* 67 F.2d 802, 803 [8th Cir. 1933]). Finally, a court's equity powers may not be exercised in such a manner as to deprive a person of constitutionally or statutorily protected rights. *Carter v. Gallagher,* 452 F.2d 315, 324 (8th Cir. 1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *United States v. Haddix & Sons, Inc.,* 415 F.2d 584, 588 (6th Cir. 1969).

*Hile v. DeVries,* 17 Kan. App. 2d 373, 836 P.2d 1219 (1992), relied upon by the trial court, is clearly distinguishable. The deceased had signed a legally binding property settlement agreement to maintain his children as beneficiaries on $50,000 worth of life insurance. In contravention of this legal obligation, he changed the beneficiary on the policy to his new wife. The big issue in *Hile* was whether fraud had to be proven before a constructive trust could be imposed. It was undisputed that the deceased had changed the beneficiary on his insurance when he had no legal right to do so.

In the case before us, Dale had every right to designate Janet, his ex-wife, as his KPERS beneficiary in September 1983. In essence, the district court imposed the constructive trust herein because Dale failed to change the beneficiary when the court concluded he had an obligation to do so arising from his "promises" to Beverly.

The use of the term "promise" by the trial court is a misnomer. Black's Law Dictionary 1213 (6th ed. rev. 1990) defines promise:

"A promise is a manifestation of *intention to act or refrain from acting* in a specified way, so made as to justify a promisee in understanding that a commitment has been made. A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct. Restatement, Second, Contracts §§ 2, 4." (Emphasis supplied.)

By Beverly's own testimony, Dale did not "promise" to make her his beneficiary. She testified as follows:

"Q. [Plaintiff's attorney]: Did you ever seek any professional advice as to your financial affairs?
"A. We did several times. On three different occasions, we did, you know, throughout our marriage.

"Q. Will you fix the time of the first such contact with a financial advisor of some sort?

"A. It was in '86 or '87. We went to a financial planner. I don't think they're there anymore, but it was in a building off from Wanamaker. Dale was real concerned about—he had taken his KPERS out, you know, when he left the State, and he was—he had started back to the State, and he kind of wanted to retire at 62, and he was real worried and upset. He wanted to make sure that he had enough to retire on, and so he was doubling his KPERS, because that was an opportunity that he had to do by going back to the State. So he was just really concerned about if he would have enough to be able to retire on at 62.

"And so we went to this financial planner, and we filled out a financial profile at that time, and we listed our assets, you know, on this financial profile jointly; and at that time, Dale had $100,000 worth of life insurance, and then later that evening at home, we discussed exactly what we had. And at that point, you know, Dale reiterated that he had $100,000 worth of life insurance, and that I would receive that, plus one and a half times his annual salary if he were to die, and also his retirement. And so that was the very first time that we talked, even really talked, about what he had.

"Q. Again, for the record, will you fix that time to the best of your ability?

"A. The best I can say was it was in '86 or '87. That's the best I can do.

. . . .

"Q. And after that, did you have any discussions with Dale further about any additional insurance benefits or optional group term insurance on either your life or his?

"A. Yes. Well, there were two occasions. We were coming home one evening from—I don't know, a movie or something. I just remember we were driving in the car, and we were talking about how we wanted, you know, if one of us were to die, we talked about how we wanted things to go; and basically, I said, you know, everything that I have, of course, he's the beneficiary of, and he knew that, and I just wanted some set aside for my nieces and nephews for their college funds, but the rest of it was his.

[Janet's attorney]: "Objection, Your Honor. Could we have some time frame when this—

"A. '90 or '91.

[Janet's attorney]: "Thank you.

"A. And then at that point, he told me, 'Well, I want you to know that I have $100,000 worth of life insurance, and my salary times one and a half times, my retirement, and my Deferred Comp.,' and I said, 'What about—what do you want me to do with your children?' He said, 'We've always treated them fairly, and I know you'll do so if I die.' So then we said, 'Well, you know, we really ought to get this in writing. We really ought to do a will,' and you know, he said, 'Yeah, we should,' but we never did.

"And, then, the other occasion was, we had been in our house for about

six months. He came home from work in September of '89 and said he had just filled out an application for $100,000 more worth of life insurance, and this was to—you know, since we incurred this substantial debt with the house, he wanted to make sure that there was enough there to pay off the house if he died, and you know, to leave enough, if he had to have a long illness, or medical bills, funeral expenses, and to take care of me.

"And so, then, I said, 'Well, you know, I don't think I have enough, either, if I were to die first, you know, to cover the house mortgage for you,' and so within the next day or two, I went to my employer, and I doubled my insurance so he would have enough to pay the house off if I were to die first. So that was the discussion then in '89."

Dale was not promising to do anything in these conversations. At most, the comments were just statements relative to acts previously done. Promises relative to KPERS benefits were not made or exchanged between Dale and Beverly. The evidence does not support the existence of a contract between Dale and Beverly whereby Dale had the obligation to change his designation of beneficiary.

Invalidating a deceased's designation of his or her beneficiary on life insurance or pension benefits on equitable grounds is nothing to be undertaken lightly and would require some compelling factual situation not present herein. We conclude that the district court's determination that Janet had been unjustly enriched and that a constructive trust should be imposed on the optional life insurance proceeds and the accumulated pension contributions constitutes an inappropriate exercise of the court's equitable power under the facts herein and cannot stand. The district court's refusal to invoke its equitable powers to invalidate Dale's designation of beneficiary as to his basic group life insurance is affirmed.

We turn now to the issues raised relative to the district court's August 25, 1993, determination that Beverly had a right of election relative to the pension benefits pursuant to K.S.A. 59-602(2). This statute, in the form applicable herein, provides:

"Either spouse may will away from the other half of his or her property, subject to the rights of homestead and allowances secured by statute. Neither spouse shall will away from the other more than half of his or her property, subject to such rights and allowances, unless the other shall consent thereto in writing executed in the presence of two or more competent witnesses, or shall elect to take under the testator's will as provided by law."

This election issue arose as an alternative request for relief. Beverly contended that she was entitled to all of the three categories of KPERS proceeds. If she did not prevail thereon, she sought half of the proceeds in each category under authority of K.S.A. 59-602(2). Chronologically, the district court decided this alternative claim for relief first, holding that all three categories were subject to the right of election. When, later, the district court imposed a constructive trust on the accumulated pension contributions and the optional group term life insurance, it reaffirmed its earlier election ruling but held the later ruling controlling. Thus, Beverly received all of the proceeds of the two categories and Janet received the basic group term life insurance proceeds. KPERS and Janet contend the district court erred in holding the statutory right of election exists relative to any proceeds herein.

Beverly and Janet agree that K.S.A. 59-602 is inapplicable herein as Dale died intestate. Therefore, there is no will for Beverly to elect to take against. The correct statute is K.S.A. 59-504 which provides:

"If the decedent leaves a spouse and no children nor issue of a previously deceased child, all the decedent's property shall pass to the surviving spouse. If the decedent leaves a spouse and a child, or children, or issue of a previously deceased child or children, one-half of such property shall pass to the surviving spouse."

In order for the statute to apply the proceeds in question must properly be part of the decedent's estate. It should be noted that Beverly J. Rice is also in this case as the Administratrix of the Estate of Dale A. Rice, deceased. The district court concluded that the KPERS benefits were in an inter vivos trust and accordingly, they were subject to K.S.A. 59-602.

The district court reasoned as follows:

"In this determination, the Court of Appeals analysis in *McCarty v. State Bank of Fredonia* is helpful. Following *Shumway v. Shumway*, 141 Kan. 835, 44 P.2d 247 (1935), the Court delineated three essential [requirements] 'in creating a trust':
  1. An explicit declaration and intention to create a trust;
  2. Definite property or subject matter of the trust;
  3. Subsequent holding and handling of the subject matter by the trustee as a trust.

14 Kan. App. 2d at 557.

"In *McCarty*, the Court found that federal statutes created the trust. *Id., citing* 26 U.S.C. § 408(h). With regard to the KPERS retirement system, K.S.A. 74-4921 creates a trust.

'There is hereby created in the state treasury the Kansas public employees retirement fund. All employee and employer contributions shall be deposited in the state treasury to be credited to the Kansas public employees retirement fund. *The fund is a trust fund* and shall be used solely for the exclusive purpose of providing benefits to members and member beneficiaries and defraying reasonable expenses of administering the fund.'

*Id.* (Emphasis added).

"Hence, the first element of the test is met. The second test can also be met because there is property in the trust. As the employee and the state make contributions toward the employee's future pension, the employee's funds are accounted for in an identifiable employee account. The third element of the *McCarty* test is also met in that the accounting and investment duties of the Board are similar to those of a trust. *See, e.g.,* K.S.A. 74-4921. This characteristic is not changed by the fact that many of the benefits are funded under contract with insurance carriers because such plans were not within the control of Mr. Rice but of KPERS. K.S.A. 74-4927(B). Hence, it may be concluded there is a trust.

"The next critical inquiry is whether the transfer is revocable. The analysis in *Ackers v. First National Bank of Topeka*, 192 Kan. 319, 387 P.2d 840 (1963), explains why this is essential and need not be repeated here. After that analysis, the Court stated:

'We conclude that the husband of a nonresident wife may, by absolute sale, gift or other transfer made in good faith during his lifetime, deprive the wife of her distributive share. However, if the transfer is colorable only and the husband retains the power of revocation, it is fallacious, illusive and deceiving, and will be considered as fraud on the rights of the widow where she is deprived of her distributive share.'

192 Kan. at 333.

"The KPERS benefits must be analyzed to determine whether Mr. Rice maintained a power of revocation. The relevant statutes provide that upon disability, leave of absence, military leave or termination of employment, a participating employee, such as Mr. Rice, may withdraw from the trust those assets which the trust has accumulated and thereby revoke the trust. While the consequences of exercising this control are more harsh (i.e., quitting work) than with most other trust relationships, it is within the employee's power to revoke the trust arrangement. Furthermore, employees may exercise options which allow additional benefits. These elections may be revoked at any time. Further, the employee retains the power to direct to whom benefits will be distributed. Hence, the conclusion reached in *Ackers* is applicable.

'The donor did not part with dominion over the trust res and the widow is not barred from claiming her distributive share of the corpus of the trust under the law of intestate succession.'

*Id.* at 333.

"It should be noted that the Court has not found any provision exempting KPERS from the application of the probate code, such as found from payable [on] death (POD) account[s] as determined in *Snodgrass v. Lyndon State Bank,* 15 Kan. App. 2d 546, 811 P.2d 58 (1991).

"Hence, applying *Ackers* and *McCarty,* the Court determines that the KPERS plan benefits are subject to the spouse's right of election. Further, it should be noted that this result is consistent with federal law under ERISA which requires spousal consent if a beneficiary other than a spouse is named. 29 U.S.C. § 1055(c)(2)."

The district court then held the KPERS benefits were subject to Beverly's right of election. Its rationale was expanded in its later constructive trust decision when it held:

"Furthermore, the Court notes the several arguments made by the other Defendants and notes: (1) Dale A. Rice did transfer a considerable amount of property to the trustee, a portion of which is retained by the trustee, by making fairly substantial premium payments which utilized money which would otherwise have been available to the joint finances of Beverly and Dale Rice; (2) while Dale A. Rice may not have explicitly executed a trust agreement, he did so implicitly by surrendering his assets to KPERS for the proper management and distribution of funds which by statute were held in trust, *see* K.S.A. 74-4921 (specifying that the funds are a 'trust fund') and K.S.A. 74-4927 (establishing a group insurance reserve fund created within the trust fund [K.S.A. 74-4927(4)(A)], empowering the KPERS Board to seek necessary appropriations, negotiate contracts and otherwise ensure the provision of insurance coverage); and (3) while the Rices were not married when the beneficiary designation was made, they were married when the bulk of the assets were transferred to the trust.

"Hence, the Court adopts the previous findings made in the memorandum decision of August 25, 1993."

By statute KPERS operates a trust fund. K.S.A. 74-4921. It does not follow that participation in KPERS is the equivalent of creating a revocable inter vivos trust such as was discussed in *Newman v. George* , 243 Kan. 183, 755 P.2d 18 (1988), and *Taliaferro v. Taliaferro,* 252 Kan. 192, 843 P.2d 240 (1992). Dale did not create a revocable inter vivos trust and then transfer marital assets thereto. By becoming a state employee, Dale was immediately enrolled in the basic group life insurance at no cost to him. This insurance

program is administered by KPERS, and Dale designated Janet as his beneficiary. At the same time Dale also applied for the first $50,000 in optional life insurance. Janet was the beneficiary therein, automatically. No one claims that Dale had no right to have Janet as his beneficiary at this time. After being employed by the State for one year, Dale was, by law, subject to the state pension plan administered by KPERS, and an amount over which he had no control was deducted each month as his KPERS contribution. As an employee cannot have different beneficiaries for different aspects of the KPERS package, no new beneficiary designation was necessary. As will be recalled, Dale and Beverly were not married on Dale's first anniversary of his reemployment by the state. There is no claim that Janet's being Dale's beneficiary at this time is in any way improper. So Janet is the lawful beneficiary on all three elements—basic and optional life insurance and employee pension contributions on Dale's first anniversary of employment.

The district court cites no authority for its conclusion that the purchase of optional term life insurance through KPERS is the transfer of assets to a trust in possible violation of a spouse's statutory rights. The purchased insurance had no cash value, and KPERS acquired no title to property therein. The premiums paid provided coverage for specified periods of time. The payment of such premiums is just a current expense—not an asset transfer. The basic group insurance was wholly paid for by the state and involved no marital assets. The ruling of the district court, in effect, makes the purchase of group term life insurance through KPERS subject to a spouse's consent if the beneficiary is other than the spouse of the insured.

We conclude the district court erred in holding that Dale's basic group life and optional group life insurance were assets subject to the limitations set forth in the probate code (designated by the court as K.S.A. 59-602, but actually is K.S.A. 59-504).

This leaves the question of the propriety of the district court's ruling as it relates to the accumulated pension contributions. For all but a month or two, Dale and Beverly were married during the period the deductions were being made from Dale's paycheck for such contributions. So, essentially, these contributions were made

from marital assets and represent a transfer thereof to a trust fund. However, the district court's decision is premised on Dale's participation in KPERS being the equivalent of his having created a revocable inter vivos trust and transferred assets therein to deprive his spouse of assets she would otherwise be entitled to. Dale did not create the KPERS trust. His contributions thereto were in the amount mandated by law as deductions from his paycheck. Dale's participation was a required condition of his employment by the State of Kansas.

K.S.A. 74-4916(1) provides: "Upon the death of a member before retirement, the member's accumulated contributions shall be paid to the member's beneficiary."

Janet was Dale's beneficiary at the time of his death.

We conclude the district court erred in holding that Beverly had a right of "election" as to the accumulated pension contributions.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded for entry of judgment consistent with this opinion.

SIX, J., concurring in the result.

LOCKETT, J., dissenting: I respectfully dissent. The majority does not cite a case supporting its finding that a constructive trust cannot be imposed on the proceeds of the optional life insurance policy issued through KPERS. The majority merely concludes that because of the nature of the trust fund and because KPERS has a rule that requires an employee to have the same beneficiary under the State retirement plan and the additional insurance policy, the district court was precluded from using its equitable powers to impose a constructive trust.

The general rule is that the insured's designation of a beneficiary is ordinarily controlling. There are exceptions to the general rule. See *Brown v. Modern Woodmen*, 97 Kan. 665, 156 Pac. 767 (1916). Under one exception, the district court has the equitable power to create a constructive trust of the proceeds of an insurance policy when it determines there is an unjust enrichment to the named beneficiary. *Tivis v. Hulsey*, 148 Kan. 892, 84 P.2d 862 (1938).

Under our prior decisions, the exception would also apply to the optional life insurance policy issued through KPERS.